**W. Leroy RAMPEY et al., Plaintiffs-Appellants,**

**v.**

**Walt ALLEN et al., Defendants-Appellees.**

**No. 73–1609.**

United States Court of Appeals, Tenth Circuit.

Argued May 15, 1974.

Decided Aug. 16, 1974.

Rehearing Denied Sept. 25, 1974.

---

Stephen Jones, Jones, Williams, Bane & Klingenberg, Enid, Okl., for plaintiffs-appellants.

Joe C. Lockhart, Asst. Atty. Gen. (Larry Derryberry, Atty. Gen. of Oklahoma, and James H. Gray, Asst. Atty. Gen., on the brief), for defendants-appellees.

Before LEWIS, Chief Judge, and HILL, SETH, HOLLOWAY, McWILLIAMS, BARRETT and DOYLE, Circuit Judges, sitting en banc.

WILLIAM E. DOYLE, Circuit Judge.

The 14 appellants, plaintiffs in the district court, seek reversal of a judgment denying relief for alleged violations of civil rights. The claims were brought pursuant to 28 U.S.C. §§ 2201 and 2202, together with 42 U.S.C. § 1983. The complaint sought injunctive relief together with a declaratory judgment (no damages) determining the ter-

mination of the plaintiffs' employment to be null and void and violative of their rights to freedom of expression and due process under the First and Fourteenth Amendments of the Constitution of the United States. Eleven of the plaintiffs were faculty members and three were administrative officers of the Oklahoma College of Liberal Arts, a statutorily created Oklahoma state institution located at Chickasha.

On April 26, 1973 the defendant Bruce Carter, President of the college, recommended to the members of the Board of Regents that the employment of the 14 plaintiffs be terminated. A majority of the Board (five to two) accepted this recommendation, and in carrying it out gave no reasons for their action. The complaint alleged that the terminations were the result of the exercise by the plaintiffs of their constitutional rights of freedom of expression guaranteed by the First Amendment.

According to further allegations, the plaintiffs held a press conference and issued a release to the media on April 24, 1973, just prior to their termination. At the press conference they criticized the policies of Carter and some members of the Board of Regents.

Originally the plaintiffs apparently believed that the press conference had been the cause of their having been fired since the terminations were related in time, but the record does not support this. The trial court also focused on the press conference, but the evidence at trial goes far beyond this.*

---

* It is to be noted, however, that the complaint broadly framed the issues for trial, alleging that the terminations resulted from plaintiffs' exercise of their First Amendment rights. The complaint · does allege First Amendment violations stemming from reprisal for the press conference. The complaint also alleges in general that plaintiffs were fired "because they exercised their right to freedom of speech and expression in criticizing Defendants and disagreeing with their policies." These criticisms of the administration referred to by the plaintiffs encompassed statements made prior to the press

conference. Paragraph 13 of the complaint states:

Said conduct by Defendants in terminating the Plaintiffs was in violation of Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution in that Plaintiffs were terminated because they exercised their right to freedom of speech and expression in criticizing Defendants and disagreeing with their policies. Said termination of Plaintiffs for these reasons is a denial of a benefit to Plaintiffs in a manner which infringes upon Plaintiffs' constitutional right

President Carter's testimony disclosed that the decision not to rehire the plaintiffs was made on April 22, 1973, after consultation with Dr. Feree. In his testimony, the reasons he gave for the firings were that the plaintiffs were "divisive" because they were unwilling to come into his office and have informal talks and because they had a tendency to talk among themselves and with the students.** In addition, one member of the faculty was accused of criticizing an address of Dr. Carter's given at an assembly and to have done so in the classroom. Carter's knowledge of this was based upon the hearsay statement of an unnamed student. The trial court generally followed Carter's statements, finding that the plaintiffs were "divisive."

At the trial (which commenced May 30, 1973), testimony was given by many of the plaintiffs and by President Carter. The district court ruled in favor of the defendants and against the plaintiffs, holding that the nonrenewal of the contracts was unconnected with the plaintiffs' exercise of their right of free speech under the First and Fourteenth Amendments. Extensive oral findings were made, and the testimony which was emphasized was the statement of President Carter that it was the divisiveness of the plaintiffs which caused their discharge and not the holding of the press conference. The court considered the plaintiffs' divisiveness to be the sole reason for the firing.

As we have indicated, it appears from the record that the decision to terminate the plaintiffs had been made, with one exception (Professor Ward), prior to the date of the press conference. Because of his years of service the plaintiff Rampey was held to have been entitled to a hearing for the purpose of determining whether sufficient cause existed for his separation.

The trial court recognized that the three administrative employees would normally have been entitled to a hearing but that the conditions at the institution were not normal so that the rule providing for a hearing was necessarily suspended.

The issue for our determination is whether the evidence is sufficient to support the trial court's findings that the firings were unrelated to plaintiffs' right to freely express themselves. If the evidence supports these findings, the judgment would have to be affirmed. We conclude, however, that the evidence fails in this regard and that the judgment of the district court must be reversed.

---

to free speech. Criticism of Defendants' policies are an impermissible basis for termination of Plaintiffs' employment under the First and Fourteenth Amendments.

Further, the case was not tried on any narrow issue. The evidence embraced First Amendment violations generally.

Nor were the trial judge's findings and conclusions restricted to the effect of the press conference on plaintiffs' subsequent termination of employment. In its oral findings, the trial court delineated the First Amendment issue as follows:

The Plaintiffs' complaints basically are that on or about April 26th of this year, their employments with the institution were not renewed by the Board of Regents and that this failure to renew their contracts of employment was because or as a reprisal for their having exercised their first amendment rights to speak critically of the president, the regents and the course of direction of the institution.

Finally, the trial judge specifically passed on all other First Amendment questions as well as the press conference when he said:

The Court finds and concludes as a factual matter from all the evidence and circumstances presented in this case, that the college president did not recommend * * * Did not recommend the nonrenewal of the contracts of the fourteen Plaintiffs as a reprisal for their exercising their first amendment rights of free speech, either by reason of the press conference or anything uttered prior thereto.

** He also explained as follows:

Q. What in general was the basis on which you decided, the negative basis upon which you decided that the fourteen plaintiffs in this case should not be included in your list: Just in general terms.

A. "I could answer that in one word really and that is divisiveness."

## THE PLAINTIFFS' PRIOR RELATIONSHIP TO THE COLLEGE

The service background of the several plaintiffs differs. Rampey, à professor in the English department, was 46 years of age at the time of trial and had been employed at the college for more than ten years. At the time of Rampey's hiring there was a tenure policy which required a new faculty member to be on probation for three years and, following the completion of the three-year period, tenure was granted. On this basis Rampey was notified in 1965 that he had achieved tenure and had the rank of assistant professor. This was accomplished without the express approval of the Board of Regents. But in May 1972, just prior to the employment of President Carter, the Board of Regents abolished the tenure system. About a year later Rampey was terminated without notice or any kind of hearing. There had been no complaint made to Rampey or to anyone else that his work was unsatisfactory. He explained that the reason for his speaking out at the press conference and prior thereto to his colleagues was because of his concern about the future of the college, which had been placed on probation by the North-Central Accrediting Association. Rampey was unaware that President Carter was then engaged in the preparation of a list of people to be hired the following year, which list omitted the names of the plaintiffs.

Bryan Ledgerwood testified that he was Dean of the college and had first been employed in 1967 as director of institutional research and development. Subsequently, he became assistant to the then president. Thereafter, he was appointed acting Dean and finally academic Dean. Ledgerwood's immediate concerns were the decrease in student enrollment, the accreditation policy and the failure of those in authority to remedy these and other problems. He also sought to research the tenure issue and discovered, according to his testimony, that the Board of Regents had never specifically granted tenure to individual members of the faculty. He had learned prior to April 24, 1973 that certain of the faculty members with contracts would not be rehired. He also testified that he had expressed his concern about the institution to President Carter and also to members of the Board. In his opinion, if a faculty member were not terminated at the end of the three-year probationary period, he automatically acquired tenure. According to Ledgerwood, this was borne out by the faculty handbook.

Dr. Leon Cherrington testified that he was age 46 and that his teaching field was history, geography and interdisciplinary studies. His employment at the Oklahoma College of Liberal Arts commenced in September 1966 and his contract had been renewed each year since then for a total of six years. When rehired for the fourth year there had been no criticism of his teaching ability. The same is true when he was rehired for the fifth year. He had been selected teacher of the year in 1968 and had had other honors and was not apprehensive about being rehired. Prior to the press conference there was no indication given that he would not be rehired and he believed that he would be. He spoke out only because he felt that it was necessary since the college was in danger, as he phrased it, of "going down the drain." The reason he did not speak to Dr. Carter during the year 1972–73 was because it was impossible to see him and the faculty members were told that they were to report directly to Dr. Feree who was Carter's assistant.

The only plaintiffs (teachers) who had completed four years at the college prior to the abolition of tenure were Rampey, Cherrington, Richardson and Wimbish. Plaintiffs Poole, Holt and Maness had completed their fourth year in May 1972, subsequent to the abolition of tenure.

## OTHER BACKGROUND FACTS

Some of the plaintiffs had never been notified that tenure had been abolished.

As we view it, the tenure issue enters into this case to the extent that it provides some insight regarding the alleged arbitrariness of the defendants. The 11 plaintiffs who were on the teaching staff were treated by the administration as one group; Dr. Carter particularly placed them in one category. This was undoubtedly because they had been a part of the so-called core curriculum teaching staff, which meant that they used an interdisciplinary approach to teaching. Rampey was a member of this core curriculum staff, although he had not been hired initially as such.

The Oklahoma statute which created the subject institution contemplated that the Regents would maintain a tenure system. However, just prior to the appointment of Dr. Carter on May 3, 1972, as we have previously noted, the tenure system was abolished. We do not regard as irrelevant the fact that the plaintiffs who were members of the teaching staff had been led to believe when they were hired that they would receive tenure if they successfully completed the probationary period. It is further to be noted that the Governor's office had secured the resignations of several of the former members of the Board of Regents just prior to the appointment of President Carter. Following the appointment of the new board members, President Carter was appointed.

The North-Central Association's report, dated March 1, 1972, analyzes the condition of the school and indicates the need for it to correct deficiencies in the library and science laboratory facilities, to eliminate dissension within the faculty, to improve faculty-staff communications and to generally upgrade the curriculum. A subsequent meeting of the North-Central Association held July 28, 1972 recommended that the school be placed on probation.

Chancellor Klotsche of the University of Wisconsin was hired as a consultant to examine and appraise the major problems of the school and to recommend solutions. In the second of three reports, written on January 19, 1973, Klotsche recommended 1) establishing a faculty grievance committee; 2) clarifying the duties of the administrators; 3) setting up better channels of communication for informing the faculty of administrative decisions; and 4) establishing an interim system of faculty self-governance.

In a subsequent report dated April 3, 1973, Chancellor Klotsche concluded that "no really significant steps have been taken during this academic year to bring the institution back into some semblance of appropriate governance with the respective role of faculty, administration and Regents clearly defined." He blamed the administration for its failure to take action to rectify the situation and for failing to follow out the guidelines which he had recommended. He also noted that there was an air of uneasiness on the campus caused by rumors of the imminent termination of some faculty members. He advised the administration against abrupt termination of faculty or staff members.[1]

The Klotsche reports are of some importance in that they highlight the problems which were in existence at the college and show also that the administration made no effort to ameliorate the situation or to remove the problems which were creating dissension. The reports also show that there were conditions which produced the dissension on

1. He added:
   I write in this manner on these matters since these are critical questions as they relate to the present probationary status of the institution with the North Central Association. One of the factors in the decision to place OCLA on public probation was the matter of governance on the campus. Matters related to termination no- tices, tenure, and due process are critical in this regard and the necessity for clearly enunciated policy on these and related matters will be of great interest to the Association when OCLA will next be visit- ed by a team to consider its probationary status.
   (Vol. II, P. 59–60).

the part of the faculty members and that such criticisms were based on real and not illusory situations.

Still another background fact was adduced from the meeting of the Regents held April 26, 1973, at which time the terminations of the appellants became official. Mr. Joel Carson, a board member who was a lawyer, objected strongly to the actions taken. He pointed out that the members accused of being "divisive" were merely seeking to exercise their right to disagree.[2] (At that meeting Carter was severely criticized by board member Carson for the former's failure to take effective measures to improve the conditions at the school.)

The most significant testimony bearing on the issue before us as to whether these plaintiffs were fired for exercise of First Amendment rights is the testimony of President Carter himself. He admitted that he had not tried to bridge the gap between himself and the dissenting faculty members. His position was that since the dissidents had not shown him "any signs of warmth," he was justified in not wanting to talk with them or to discuss possible solutions to the problem.

## THE TESTIMONY ON CROSS-EXAMINATION

President Carter throughout his testimony characterized the individual plaintiffs as being "divisive" and explained what he meant by the term "divisive."

Carter considered Dean Ledgerwood "divisive" because on one occasion the Dean defended another faculty member's right to criticize the administration.

He considered the appellant Rapplean "divisive" because he characterized Carter as being "a three time loser" following Carter's having been outvoted by the majority of the students in three controversial campus issues.

Appellant Maness was "divisive" in the mind of President Carter because he had told Dr. Feree that the latter could not communicate.

Wimbish was "divisive" because he spent too much time during the final two weeks of the semester talking to students in the dining hall. Carter said that if Wimbish had not spent "hour after hour after hour talking with students" he would have been rehired.

Carter admitted that he found Cherrington "divisive" because he allegedly criticized a chapel speech of Carter's in the course of a class discussion. But this information came to Carter secondhand through a student whom Carter refused to identify. There was testimony from a student who had been in Cherrington's class on the day of the alleged incident to the effect that Cherrington had not criticized Carter at all but, rather, had led a class discussion concerning the advantages and disadvantages of a liberal arts education.

Carter testified that appellant Bolton was "divisive" because he had sought clarification as to the scope of his duties as director of personnel.

His appraisal of appellant Ingrid Poole was that she was "divisive" because "We live in different worlds; we live in different atmospheres; we have different philosophies."

2. He added:
   Has it ever occurred to you, Dr. Carter, that what these people whom you recommended for firing are saying . . . is "Give us some direction; give us some sense of direction, and if we disagree with you, we will tell you and we will see if between us we can modify it for the greater good of the college."
   (Vol. II, P. 91).
   Another member of the Board stated at an earlier meeting of the Regents:

I would like to get up and walk out and resign off the Board. Why people . . . will come in here and lie and tell this Board old so-and-so said this and old so-and-so said that. And who are we to judge? That's ridiculous. I would hate to teach where that was imposed on me. You couldn't say what you wanted to. What's happened to free speech?
(Vol. II, P. 170).

Carter also explained that he found the appellants uncooperative and "divisive" as a result of their failure to join certain associations such as the Oklahoma Educational Association and the Oklahoma Higher Educational Alumni Counsel.

There is evidence to establish that Carter considered that the group as a whole was "divisive" because they associated together. This is particularly true with respect to Dr. Ward, the single individual who was not rehired on the basis that he participated in the controversial press conference.[3]

There is attached hereto as an appendix to the opinion a more detailed account of Carter's testimony. The only inference to be drawn from a reading of this testimony is that Dr. Carter demanded absolute loyalty, required faculty members to come in and visit with him, prohibited their discussing problems of the college among themselves and prohibited their having informal discussions with students, for if they did any of these things they were considered by Carter to be "divisive." One has to conclude that his concept of being "divisive" was based on a person's failure to agree with him or relate to him. If there had been no display of "divisiveness" he was prone to say that the individual faculty members lived in a different world or that their philosophies were fundamentally different from his. All this shows that the plaintiffs were fired for having failed to refrain from associating with their colleagues and for having failed to associate with President Carter. Thus, we conclude that, in exercising their right to freely associate with others and to criticize the administration of the school (notwithstanding that such criticism was justifiable) and in refusing to submit to the exercise of control over them, the plaintiffs were fired.

## THE TRIAL COURT'S FINDINGS

The trial court adopted the conclusion of President Carter that the plaintiffs were "divisive" and that this was the cause of the conflict and the firings. The court mentioned in its oral findings that the plaintiffs might have been responsible for the college's having been put on probation.[4] He mentioned that "There is something wrong in the institution and it is necessary to find out what was wrong in the institution." He went on to say "It is the Defendants' views that one of the things, if not the principal thing, wrong with the institution was the lack of cooperation of the Plaintiffs. The hostility of the Plaintiffs towards the administration. The divisiveness within the faculty attributed by the Defendants to the Plaintiffs."

There is a lack of evidence to support this observation. The report of the North-Central Association, an impartial source, did not attribute the problems to the plaintiffs. It did mention dissension within the faculty and a lack of communication between faculty and staff, but it did not identify the plaintiffs with it.

Nor did Chancellor Klotsche of the University of Wisconsin at Milwaukee attribute the trouble to the plaintiffs. He found fundamental administrative difficulties. In fact, the Klotsche report actually placed blame on the administration for its failure to take steps to solve the problems which an earlier report had pointed out.

The trial court's findings ignore the most important testimony in the case, that of Dr. Carter, which is appended hereto and which, on its face, reveals

---

3. On this Carter said:

Dr. Ward made his choice along with the other thirteen and we had hoped we could save him. We had hoped that we could keep him with us and we had recommended him (for reemployment) . . . and when he determined that he did not want to have any part of us, that he wanted, went along with the dissidents, why then I said, if that is his choice, it suits me all right.
(Vol. III, P. 272–273).

4. This was speculation. It was not borne out by the evidence.

that the problem was largely with the attitudes and actions of Carter himself.

Bearing in mind that the thrust of the court's ruling in favor of the defendants is that the plaintiffs were "divisive" and thus not in agreement with the administration, the question is whether the court's findings or conclusion that the plaintiffs were "divisive" are to be sustained in the light of the explanations given by Dr. Carter as to what he meant by "divisiveness."

## SUMMARY OF APPLICABLE LAW

The First Amendment guarantees freedom of expression in a wide variety of relationships and conditions. But a fundamental area in which this constitutional freedom is recognized is in the right of association. Some of the numerous cases recognizing this are collected in Healy v. James, 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972). In that case the Court said:

Among the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs. While the freedom of association is not explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition. See, e. g., Baird v. State Bar of Arizona, 401 U.S. 1, 6, 91 S.Ct. 702, 705, 27 L.Ed.2d 639 (1971); NAACP v. Button, 371 U. S. 415, 430, 83 S.Ct. 328, 336, 9 L.Ed. 2d 405 (1963); Louisiana ex rel. Gremillion v. NAACP, 366 U.S. 293, 296, 81 S.Ct. 1333, 1335, 6 L.Ed.2d 301 (1961); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

Apparently the only factor counterbalancing this right is prevention of disruption. See Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

In Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960), the Supreme Court noted the sensitiveness of the academic community and the importance of upholding the rights of freedom of expression in this atmosphere. In that case the court said: ". . . the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."

Also, in Keyishian v. Board of Regents, 385 U.S. 589, 604, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967), the right as it exists in the school setting was discussed. It was there pointed out that the school is a marketplace for exchange of ideas in American society and that the limitations on free speech can chill this free exchange. The Court said at p. 604, 87 S.Ct. at p. 684:

When one must guess what conduct or utterance may lose him his position, one necessarily will "steer far wider of the unlawful zone * * *." Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460. For "[t]he threat of sanctions may deter * * * almost as potently as the actual application of sanctions." NAACP v. Button, supra, 371 U.S. at 433, 83 S.Ct., at 338.

Thus, present and future freedom of expression as well as prior freedom is protected.

There is some authority that limits criticism. See, for example, Clark v. Holmes, 474 F.2d 928 (7th Cir. 1972), cert. denied, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973). There the instructor was guilty of frequent criticisms and belittling of other staff members. He was engaged in frequent disputes with his superiors over course content and counseling. It was not surprising that the Seventh Circuit refused to protect these excesses. Nothing like these instances are present here. The evidence in our case does not establish that plaintiffs as a group or individually were troublemakers.

Our case is indistinguishable on its facts from Smith v. Losee, 485 F.2d 334 (10th Cir. 1973), wherein we held that a faculty member's rights had been violated when his contract was not renewed because of his anti-administration atti-

tude and his outspoken criticism of and negative attitude toward the administration. *See* 485 F.2d at 339.

In *Pickering, supra,* the Supreme Court recognized the importance of allowing a teacher to speak out freely on matters of public concern without fear of retaliatory dismissal. The Court held that the review standard calls for a balancing of the teacher's interests in commenting on controversial issues against the state's interests in promoting the efficient operation of the service it performs for the public. The Court held that the teacher's right to express his criticism of the administration was paramount, noting that the relationship between the school board and the teacher was not one which called for personal loyalty and confidence.

Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), which followed *Pickering,* is a case in which the Supreme Court condemned the action of the college in not renewing the plaintiff's contract on account of his public criticism of the policies of the administration even though the plaintiff did not have tenure. The Court said that his allegations presented a bona fide constitutional claim.

Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) recognized the breadth of the right here involved, holding that it extended to the wearing of black arm bands.

■ At bar the appellants have made a very substantial showing that they were exercising First Amendment rights, and the record fails to disclose that their activities were in any way excessive or unduly burdensome to the school.

In the last analysis, it was the plaintiffs-appellants' refusal to conform to President Carter's patterns and molds, all of which were personal and subjective on his part, which was the cause of their being fired. Surely the right to be free from this kind of personality con-

trol is a constitutionally protected right under the First Amendment since it is a species of expression. One had to become a person who was in his image and likeness if he or she wished to serve as a member of the faculty at OCLA. By his own testimony Carter is shown to have been jealous of his power and insecure in his position as well as unable to tolerate any dissent, criticism or disagreement, all of which he called "divisiveness." Yet there is no evidence that the appellants constituted any threat to the operation of the college—to Carter personally, perhaps, but not the college.

The evidence supported the view that the appellants' classes were well regarded by the students. Consider, for example, the classes of appellant Holt about whom Carter stated "He would not and could not do his job" and he "didn't fit into the atmosphere of the college at all." At the same time, the students voted him the outstanding teacher of the year in 1969 and requested that he be the commencement speaker that year.

■ While a college president is entitled to respect and authority within his sphere, this does not extend to the exercise of absolute control over the associations and expressions of the faculty members. Whether they demonstrate loyalty to him personally, whether they relate to him personally and whether they have a similar philosophy is not, as we view it, a requisite and he cannot demand such attitudes at the expense of the individual rights of the faculty members and there can be little question but that such demands infringe the rights of the faculty members to express legitimate views in the course of formulating ideas in an academic atmosphere. There is not the slightest suggestion in the evidence that the plaintiffs in exercising their rights constituted any threat to the valid authority of President Carter in the conduct of his duties. Nor does it appear that these plaintiffs were in a relationship with Dr. Carter which required personal loyalty or devotion. *Cf.* Pickering v. Board of Educa-

tion, 391 U.S. 563, 574, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968).[5]

■ Finally, the trial court's determinations have ignored Dr. Carter's explanations as to his concepts of "divisiveness." These explanations were frivolous. Nor can the court's finding that Dr. Carter had correctly appraised the general attitudes of the plaintiffs furnish any legal basis for a finding of "divisiveness" or antagonism. Also, the trial court's emphasis on the press conference and its ignoring or putting to one side the stifling of their expressions was unjustified. The judgment of the court based upon these findings must be considered out of harmony with the evidence and clearly erroneous.

Since, therefore, the First Amendment rights of the plaintiffs, as enunciated in such decisions of the Supreme Court as *Sindermann*[6] and *Pickering, supra*, were violated by terminating plaintiffs on account of disapproved associations, or disapproval of statements made, or on account of President Carter's disagreement with plaintiffs' philosophies, or his belief that plaintiffs lived in a different world from his, the judgment of the district court must be reversed and the cause must be remanded for further proceedings consistent with the views expressed herein.

## APPENDIX—SUMMARY OF THE TESTIMONY OF DR. CARTER

### I.

### INTRODUCTION

Dr. Carter's testimony consists mostly of generalizations and internal contradictions, most of which emerges as inconsequential, leaving the reader with the impression that he had no substantial reason for the firings. Carter does clearly acknowledge that the persons in question were not dismissed for financial or budgetary reasons. (R. 409). Nor were they dismissed because of their academic or professional qualifications or achievements, since Carter acknowledges that most of the plaintiffs were "excellent teachers" (R. 376); that in response to cross-examination about one teacher, Carter stated he didn't "question his ability or talents" (R. 366); and in regard to questioning about a different teacher, he displayed a lack of awareness about the teacher's specific achievements, and acknowledged that he had not looked at the teacher's personnel file before reaching a decision to recommend his dismissal (R. 365). The absence of any other discussion about professional abilities in the record clearly indicated that this factor was not a reason for the dismissals of the plaintiffs.

### II.

Dr. Carter prefaced his testimony concerning the reason for dismissal of the fourteen plaintiffs by stating: "Well, I had been employed as President of the college by the Board of Regents to go into a sick college, to go into a situation that was devisive, that was very bad, very critical, a powder keg. . ." (R. 269–70). When asked to give his reason for dismissal of the plaintiffs, he stated: "I could answer that in one word really and that is devisiveness." (R.

---

5. The Supreme Court said in part:
This Court has also indicated, in more general terms, that statements by public officials on matters of public concern must be accorded First Amendment protection despite the fact that the statements are directed at their nominal superiors.
\* \* \*

6. The Supreme Court there said:
It [the government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests— especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460. Such interference with constitutional rights is impermissible.
408 U.S. 593, at 597, 92 S.Ct. 2694, at 2697.

270). In keeping with this position, Dr. Carter refers frequently in his testimony to the dismissed plaintiffs as the "dissidents."

Dr. Carter elaborated on this concept of "divisiveness" at several points during his testimony. Referring to the five-week and ten-week summer teaching assignment lists, he stated: "We had determined that those who were divisive, those who would not cooperate, those who would not work with us, that we would not employ them during the ten weeks period of time." (R. 277). He later stated: "I have been studying all year as to the ones that I felt we could live with and build a college with and during the course of the year, we had discussed, Dr. Feree and I had discussed certain ones and we had mutually arrived at a decision on some of them that we could not depend on. They were divisive." (R. 287). (Other parts of the record reflect, however, that Carter made his decisions about who to eliminate quite early in the year.) He referred to "about half" of the teachers as having "very bad" attitudes (R. 292), and further stated: ". . . you go over them months and months and months and you live with them and you see their attitude and their atmosphere and their climate around which they build and surround themselves. . ." (R. 294). In explaining why he never called any of the "dissidents" in to discuss their grievances, Carter stated: "I thought about doing it many times. I kept thinking, and by the way, a number of the faculty members did come in and, that are not among this group, and little by little, why they came in and visited with me and talked with me and said, what can we do to help and what can we do to cooperate.

"And so, these individuals did not, and there was hostility in every action and every movement and criticism in classes and working with students and the students in turn would reflect their answers." (R. 354).

### III.

Despite these broad generalizations about the dismissed group as a whole, Dr. Carter often found it impossible to specify what this "divisiveness" consisted of in individual cases or examples. He would either mouth more generalizations, give instances which appeared to represent misunderstanding or personality defects on his own part, or most importantly, refer to situations where he chose to condemn or categorize a teacher because of exercise of speech, or associating with someone who spoke out on an issue. A list of references which Carter made concerning various teachers and staff members who were dismissed will illustrate this better than comment:

A. *Rampey*—"Mr. Rampey was one of those who never entered my office. He never made any effort in the world to go along with me or to cooperate or to work with me in any way. So, he was one of the early ones that I figured was devisive and was working against the administration." (R. 292).

"Mr. Rampey was the one that made the talk and said, you cannot communicate. And Dr. Feree had met with this particular group, why, he is the one that spoke out and said, why you can't even communicate." (R. 354).

"General attitude, general feeling of hostility."

Q. How was that general attitude and hostility expressed?

"Well, that would be difficult to say." (R. 354–55).

B. *Dr. Ledgerwood*—(Academic Dean) —In response to a question as to when he had decided to terminate the Dean, "Yes sir, that was pretty early."

Q. How early?

A. "As soon as I found out that too many leaks, too much association with the dissidents."

Q. Who are the dissidents, or who were the dissidents?

A. "I read the list of them that I felt like, the earlier ones that I had felt like

that we would have to get along without if we were going to build a college."

Q. He was associating then with Rampey, Poole, Cherrington, Richardson and Tanton?

A. "Yes, sir."

Q. I assume he was also associating with other people on the faculty. Is that not true?

A. "It wasn't just a question of his association with them. I lost my confidence in him earlier. . ." (But Carter does not give further explanation at this point as to why he "lost confidence" in Ledgerwood.)   (R. 307–08).

"Dr. Ledgerwood had been my friend for a long time and we had known each other and I think I made a recommendation to him when he got his job. And I needed help, I needed it, because this whole situation was volatile. It was very very bad to begin with and there were many many occasions when Dr. Ledgerwood could have helped me when I felt like he didn't. And I talked to him as the dean of the college, as soon as Mr. Cherrington had been critical of what I had said in an assembly and I talked with Mr. Ledgerwood and this was early in my administration. And I asked him what he thought about it and he said, well, he thought it was all right, or words to that effect. He didn't, he felt like maybe that Mr. Cherrington had a right to be critical of me in the class before his group. . ." (R. 355).

". . . and I noticed that his committees would be selective. We appointed one or two committees and I asked him to appoint the committees and I felt like the students he appointed on the committees were hostile students, as far as I was concerned. . ."   (R. 355–56).

"Well, as I said, there were many times during the course of the year when I felt like he could have assisted me and helped me when he did not do this."

Q. And you consider that devisive?

A. "Yes, sir."   (R. 356).

C. *Cherrington*—". . . the first meeting, for instance, that Mr. Cherrington had with his class after my assembly that he ran me down considerably and had his students vote on me and was totally uncooperative the first weeks I was there."

Q. Did you hear that personally?

A. "No, sir, I did not. But several students came to me about it. No, I did not, I was not in the class."

Q. Did you confront Mr. Cherrington with it?

A. "I talked to Gene. I talked to the Dean of the college about it and I told him that I felt like that it was not the place of the teacher to criticize the president of the college and to disagree, publicly, in his classes with what I had said in the chapel assembly that particular morning. I did not talk to Mr. Cherrington, but I did talk to Dr. Ledgerwood."   (R. 288–89).

(Dr. Carter could not identify who the students were who had informed him about this incident which allegedly occurred.   (R. 388).)

D. *Wimbish*—"Well, I had hoped to reemploy Mr. Wimbish and had intended to until two weeks before, on, seems to me like he was cooperating reasonably well and had gone along fine and then the last few weeks he spent all his time talking with students and I thought, stirring up trouble. So, he was one of the very latest ones that I made my mind up on."

Q. Dr. Carter, you are using the expression, he was talking with students, and I—do you have an opinion that every time a faculty member talks to students he is stirring up trouble?

A. "Oh, no, no, no."

Q. What do you mean?

A. "Well, he was spending his time in the dining room talking to students, talking to them to get them to go along with the dissidents."

Q. How do you know he was doing that?

A. "Well, I listened to one or two students that heard him, what he was talking about and according to them, and working with them and then the director of the dining hall services gave a report on the fact that he was over there, hour after hour, day after day." (R. 314–15). ". . . as I said, up until two weeks before I had hoped to reemploy Mr. Wimbish, for instance, but he spent that last two weeks over in the dining hall, hour after hour after hour talking with students and working with students. . ." (R. 295).

E. *Poole*—"I had earlier decided that we could not build a college around Mrs. Poole."

Q. When did you decide that?

A. "Oh, probably by Christmas." (R. 308).

Q. How about Ingrid Poole, how was she devisive?

A. "Well, Mrs. Poole came to my office three times. I can say that she did that."

Q. In other words, she did attempt to communicate with you?

A. "That is right, that is right."

Q. All right, sir.

A. "and I would probably say that it was a matter of, we live in different worlds. We live in different atmospheres. Different philosophies."

Q. Any other way she was devisive?

A. "Well, it is pretty difficult to bring in students and to discuss student situations that you know are happening and yet you can't prove a situation like this."

Q. You know it, but you can't prove it?

A. "Well, you know it in your heart and mind and soul, but then you would have difficulty proving it, yes, sir, that is true." (R. 357–58).

F. *Holt*—Q. How was he [Holt] devisive?

A. "These are very personal matters."

Q. Well, I am not asking about personal matters. I am asking about how he was devisive.

A. "He didn't fit into the atmosphere of the college at all, according to my way of thinking as president of the college and my duties and responsibilities of the college, to protect it, and to recommend the people that I think you can build a college upon." (R. 363–64).

G. *Maness*—Q. With respect to Mr. Maness, when had you decided on him?

A. "Well, reasonably early."

Q. When?

A. "Oh, say by Christmas."

Q. Earlier?

A. "When you're in the process of making your mind up, you have got all year. So, you don't come up with a definite particular time, but he had proven that he was not going to cooperate and work with us."

Q. Devisive?

A. "I beg your pardon?"

Q. Devisive?

A. "Yes, sir." (R. 312).

". . . We had a resignation, I believe Mr. Maness and Dean Ledgerwood appointed Mr. Bolton to fill this particular place in the corps curriculum program and I was president of the college and he never discussed it with me or never said a word to me about it at all, so as far as I am concerned the two of them got together and decided that Mr. Bolton would be appointed and I wasn't even notified about it or didn't even know about it until a week after it happened."

Q. When you did find out about it, did you rescend [sic] it?

A. "No sir." (R. 360).

Q. . . . With respect to Mr. Maness, how was he devisive?

A. "Well, I mentioned a little bit ago that he was the one who said to Dr. Feree, that you cannot communicate."

Q. Any other way?

A. "General attitude, hostility."

\* \* \*

"I really don't question his ability or talents. It is a question of his hostility and general attitude." (R. 365–66).

H. *Rapplean*—" . . . his spirit of cooperation was not good and so, we decided we would get along without him." (R. 313).

(At page 366–67 of the Record, Dr. Carter goes through a long discussion about three different policy issues upon which he had taken one position which had turned out to be embarrassing. One issue involved the use of a particular college seal which created an uproar among the faculty and students. The two other issues, involving pay to student council members and a proposal for election of officers in each student class, were defeated after Carter submitted them to votes by the student body). " . . . And so, Mr. Rapplean said, well, he lost three times. I wonder when he is ever going to learn anything. So, that was his general attitude." (R. 367).

I. *Richardson*—"I didn't come in contact too much with Mr. Richardson in the course of the year. I would say it is just a general attitude of hostility and a feeling that I have no overt action as far as he was concerned. But then there was just a general lack of communication and no rapport." (R. 368).

J. *Tanton*—Q. How was he devisive?

A. "Oh, almost every action, everything he said or did."

Q. Such as?

A. "It would be a little bit hard to pinpoint any one particular idea, but you felt his hostility and his uncooperative attitude very very definitely." (R. 369).

K. *Bolton*—"Well, I felt like that Mr. Bolton, several times, was pretty definitely devisive, sir. He was one who was complaining always about not knowing his job and not knowing what he ought to do and he talked to me sometimes about this and sometimes a good many times to Dr. Feree about it and I know we even gave him a North Central Report that had been approved showing that this is what a personnel director would do, or should do, and he would say, well, what do you want me to do, and I talked to him one time and I said, well, you have been here, you have been personnel director. Go ahead and do what you have been doing."

Q. Well, he was one of those people you had not made up your mind on before March 31st isn't he?

A. "A great deal of this time, Mr. Bolton, to begin with, the early months we talked and worked together, and got along reasonably well."

Q. Well, so then he did come in and he did talk to you about his problems and what you expected.

A. "Well, to, but then, as time went on, why you could very definitely feel he was getting away without any particular question at all and one thing I want to —that I do recall here in question with Mr. Bolton, and Dean Ledgerwood both, and this is just one of the other examples." (Herein follows Carter's account of Bolton's advancement without Carter's knowledge to a position in the core experimental program. This account is found above under the criticisms of Mr. Maness.)

\* \* \* \* \* \*

Q. Well, now you're familiar with Mr. Bolton's career at O.C.L.A., were you not? I mean, he had been there for four years.

A. "I didn't know how long he had been there but as I said, the further we went the further he got away. In the first place, we would ask him, we did specifically ask him to see one or two students. He said no, the student has got to come to see me in place of me going to see the student. And so, we would ask him to look into situations and he would say, I am not going to do that, they are going to have to come to me."

Q. Excuse me, I thought these people were discharged because they were devisive. Now are you telling me this is devisive or just poor administration?

A. "That is lack of cooperation, sir." (R. 359–61).

L. *Ward*—Q. All right. When was Mr. Ward's name stricken through?

A. "Mr. Ward's name was stricken through on the morning that we had the board meeting."

Q. Who did this?

A. "I did it. The fact of the matter is, I almost forgot it."

Q. What was your reason for that, Dr. Carter?

A. "Every man, every man makes his choices whether he smokes or doesn't smoke, whether he drinks or doesn't drink. The choice of a wife, the choice of a job and Dr. Ward made his choice along with the other thirteen and we had hoped we could save him. We had hoped that we could keep him with us and we had recommended him along with the others that had been recommended and when he determined that he did not want to have any part of us, that he wanted, went along with the dissidents, why then I said, if that is his choice, suits me all right." (R. 272–73).

Q. All right. Dr. Carter, I will ask you to advise the Court to, the extent to which, if any, the press conference's statement had on your recommendations to the Board on the 26th of April?

A. "Well, I would say with the exception of Dr. Ward, absolutely none." (R. 282).

Q. My question is, do I understand that by April 23rd or I am sorry, April 22nd, that is Sunday afternoon, 1973, you had decided against recommending any of the fourteen Plaintiffs for reemployment with the exception of David Ward?

A. "Any of the thirteen, yes, sir, or the fourteen, with the exception of David Ward, yes."

Q. And do I further understand that your testimony is today that you had decided to reemploy Dr. Ward, but because he participated with the other thirteen in the press conference, you struck his name on Monday morning?

A. "No, sir, no, sir, I did not say that at all."

Q. What did you say? What did you mean?

A. "I said that each man chose his wife, his job, his occupation, whether he smokes or drinks and he chose to decide what group he would live with and he chose the dissidents in rather than choosing those who would cooperate and work with me."

Q. How did he do that, or let me put it this way. What did he do between Sunday, April 22nd, 1973, and the morning of April 26th when you struck his name other than the appearance at the public press conference?

A. "He proved by doing this that he had chosen the dissidents to live with rather than the, to cooperate with me and with the rest of the school."

Q. When you say he chose to do this, you mean he chose to be with them and to put his name on the statement that they read. Is that what you mean?

The Court: He has answered your question.

A. "Probably so, probably so. He chose, he chose his way of life. He chose what he wanted to do. He chose which way he wanted to go."

Q. Is there any other thing he did during that period of time other than that?

A. "I am sure that, I would say no." (R. 290–92).

Questioning by the Court:

Q. My question is, did you line him [Ward] out because of the press conference?

A. "I lined him out, as I said, I did not see nor hear the press conference. I did read about it and he made his choice and his choice was to go with this particular group, Judge, and because he had made his choice I made my choice."

Q. Well, my question is, did you line him out because he participated in the press conference?

A. "I would probably have to say that I probably did. Not because of any-

thing that he said or done, but then he was with the group."

Q. Well, this could make a difference. You can't fail to renew an instructor's contract if it is based on first amendment conduct.

A. "Judge, that didn't enter into it as far as I was concerned, at all. We had worked with him off and on all year and it was a matter of whether or not he was going to cooperate with me or with the dissidents. Divided group. And when he placed himself in his own category, why he determined his choice and if he ever said a word in the speech deal or anything about it, I don't know anything about it. I really don't." (R. 411–12).

### IV.

As illustrated by the above testimonial examples, Dr. Carter had a good deal of difficulty in providing specifics as to why the individual plaintiffs were "divisive" in his eyes. This difficulty stemmed in large part from Carter's tendency to think of the plaintiffs *as a group* rather than as individuals. Carter's assessment of the college's teachers and staff, his "grading" of them as he frequently referred to it (R. 270, 294–95), seemed to stem from an assumption that there were two polarized camps at the college, those that were "for" him personally, and those that were against him. He appears to have begun his job as president with this assumption rooted in his thinking, or to have reached it quite early in the year:

"I had two faculty meetings. One in the summer and one in the fall and in the fall faculty meeting I had high hopes of pulling the faculty together. I did go in there with a statement and so help me, and I am under oath, as with the fact that I could weld the faculty together and that we could work together and I asked them to cooperate to pull together, to work together. I asked them to pray about it. I asked them as Oral Roberts would say, to, let's have a miracle happen on this campus and one of the very first things that happens, which proves to me this whole set up is primarily these thirteen or fourteen people, is, *there is a conspiracy or was a conspiracy.* (Emphasis added.) I pleaded with these people and they will tell you so, in fact, one individual said that I threatened them even. I pleaded with them to join the Oklahoma Educational Association and the Higher Educational Alumni Council. These are two organizations that benefit higher education a tremendous lot in Oklahoma. And almost to a man, and I have this information over here if you need it. Almost to an individual, why this group said, no, we will not have any part of O.E.A. or Higher Education either one. And this was an indication earlier that to begin with, that they did not intend to cooperate and would not cooperate."

Q. And that was a factor in their devisiveness which was a factor in your determination to, in your decision to terminate them?

A. "During the course of the year, this was added to many, many times."

Q. But it was a fact?

A. "Oh, yes, yes." (R. 292–94).

Having determined in his own mind that there was a core group of "dissidents" on campus which he could not "build a college around," Carter's efforts seem to have been directed to identifying members of the staff and faculty whom he could lump in with the vaguely defined group of "dissidents." When directly questioned about this by the Court, Carter had difficulty articulating his reasons or methods of identifying members of the group:

The Court: I think you are getting off the question now. I would appreciate it if you would tell us how you identified this group. How you came to know that you had eleven out of 55 who were devisive, and identify them. How did you do this? How did you learn this? And then when you say

that they were devisive, on what do you make this statement? . . . A. "Well, as I said, we, I asked Dr. Feree to meet with the faculty group with this corps program group and he did meet with them, or tried to meet with them and one of the members spoke up and after he tried to get them to cooperate and work together, and he said, you cannot communicate . . ."

"And another illustration, for instance, as I mentioned, one of the faculty members that was on the stand yesterday said that we were great friends for thirty years and yet I have been there eleven months today and he has never been in my office. And most of these people have never been in my office and have never shown me any signs of warmth or nothing but hostility. And they have not been in my office or not talked to me except, we would meet in the hall. Now, I did not feel I could call them in and talk to them and single them out and say, now you have got to cooperate with me. You have got to help me. You have got to go along with the program. It looks to me like we would have isolated them and put them in an embarrassing position and they might have felt under coercion or threats or intimidation if I had done that. . . ." (R. 352–53).

(It should be noted that, rather than put the teachers he referred to in an "embarrassing position," he chose to terminate their jobs.)

Yet despite Carter's tendency to view the "divisiveness" of individual plaintiffs in terms of hostility to himself, the record reveals a pattern of such categorization because of instances in which individuals exercised rights of speech or expression, or associated with others who did. Ward's case seems the clearest, since he was undisputedly dismissed because of his choice to publicly express his sympathy with a group of teachers who would apparently soon be recommended for dismissal. The "chilling ef-fect" of permitting his dismissal to stand is obvious, for the message would otherwise be clear to any other remaining member of the faculty or staff who might feel that the president had made the wrong decision in a matter which was obviously of vital concern to all persons associated with the college. Any disagreement with the president on this issue, or perhaps any other issue in the future, might cost them their jobs.

Wimbish's dismissal also fits this pattern, since he was not considered for dismissal until the last two weeks of school, when Carter felt that Wimbish began spending too much time talking to students in the dining hall. Carter felt such discussion represented opposition to himself, even though his knowledge of the content or subject of the discussion came to him only through hearsay rumor from a few students he could not identify. Wimbish lost his job as a consequence of these student discussions.

Cherrington's situation also fits the pattern, since Carter's only criticism of Cherrington was that he "ran me down considerably" in discussion with his students after an assembly Carter had held. Once again, Carter's only knowledge of the substantive content of such criticism, if it in fact took place, came to him through hearsay reports of students he could not identify. This incident seems to have formed Carter's opinion of Cherrington and cost him his job. Any other faculty member concerned for his job would likely be reluctant to criticize the administration before his students, or indeed to say anything which might be interpreted and reported back to the administration as criticism.

SETH, Circuit Judge, with whom LEWIS, Chief Judge and BARRETT, Circuit Judge, join (dissenting):

I must respectfully dissent from the opinion and the position taken by the majority. Certain statements made in the majority opinion must be examined to demonstrate how the conclusions therein are reached to reverse the trial

court, and the evidence upon which they are based. Some of these statements must be quoted; for example, the majority says:

"In the last analysis, it was the plaintiffs-appellants' refusal to conform to President Carter's patterns and molds, all of which were personal subjective on his part, which was the cause of their being fired."

The record clearly leads to such a conclusion as to the cause, although the majority points to no specific incidents or criticism, no specific exercise of free speech, just the characterization of the attitudes of the two groups, the tone and tenor of the opposition, and the quotation above. This, again, is really all the record shows, but this is not helpful to a solution of the problem before us on constitutional grounds.

The majority continues:

"Surely the right to be free from this kind of personality control is a constitutionally protected right under the First Amendment since it is a species of expression. One had to become a person who was in his image and likeness if he or she wished to serve as a member of the faculty at OCLA."

Thus freedom from "personality control," this last analysis of the cause, is described as a constitutional right. This is where I must depart from the majority because this is a confusion of First Amendment rights with the classical reasons advanced for teacher tenure. The majority is substituting tenure reasons for a constitutional right. This is innovative and would perhaps serve a worthwhile purpose. It could serve as a protection against terminations based on "inability to conform to the image of the president" of the school, for being a "threat to the power of the president," and for "being in disagreement with a president who does not tolerate disagreement," or for "not conforming to the president's patterns and molds." This type of protection from "personality control" has a great deal to recommend it, and it would appear that the various

state tenure laws have something like this in view. Thus perhaps we should subscribe to such a concept, but I am unable to fit it into the protections afforded by the First Amendment to the Constitution and thus must dissent.

The majority position is centered upon the testimony of the president of the school. The majority expressly points to that part of his testimony upon which its opinion is based. This statement in a separate paragraph is clear, and sums up the position. The opinion states:

"The most significant testimony bearing on the issue before us as to whether these plaintiffs were fired for exercise of First Amendment rights is the testimony of President Carter himself. He admitted that he had not tried to bridge the gap between himself and the dissenting faculty members. His position was that since the dissidents had not shown him 'any signs of warmth,' he was justified in not wanting to talk with them or to discuss possible solutions to the problem."

This is followed by references by the college president to the divisiveness of the plaintiffs.

The "most significant testimony" in the whole record bearing on the First Amendment issue thus is the admission of President Carter that he had not tried to bridge the gap between himself and the dissenting faculty members. The need to "bridge the gap" was thus either the basic First Amendment issue, or a failure to try to do so was a violation of plaintiffs' constitutional rights. In any event, the evidence on such a failure is described as the most significant testimony bearing on the First Amendment issue. This testimony, in fact, is the most significant on the issue; the record so demonstrates, and the other evidence is less important. However, this evaluation should be instead considered as a commentary on the absence, or misdirection, of the proof on constitutional issues rather than any-

thing else. Thus I must dissent from the position taken by the majority that this testimony can lead to any constitutional conclusion. It can, of course, lead to nonconstitutional issue conclusions. And again no one can really take exception to a criticism for a failure to negotiate, if this is what is referred to. If the president did not bridge the gap, perhaps this was a serious failure as president, but this appears to be more an evaluation of a matter of school administration, or diplomacy, or common sense. In any event it is really something we do not have to decide. It is very difficult to find in it a constitutional issue or any issue which we should decide. I am unable to do so.

As above indicated, the majority points to no specific incident of criticism (not considering the press conference, which the majority has apparently excluded as a factor in the case), and the record contains none. One incident is referred to by the majority, but of this the opinion says: "Carter's knowledge of this was based upon the hearsay statement of an unnamed student." Thus none are left. Also the complaint alleges no *facts* relative to First Amendment rights except the press conference. It is difficult, with such a foundation in the proof and pleadings, to understand how the majority can overturn the findings of the trial court, or to understand how the plaintiffs met their burden.

The majority says that the issue before us is whether the record supports the findings of the trial court. The trial court found:

"The Court finds and concludes as a factual matter from all the evidence and circumstances presented in this case, that the college president did not recommend a failure. Did not recommend the non-renewal of the contracts of the fourteen Plaintiffs as a reprisal for their exercising their first amendment rights of free speech, either by reason of the press conference or anything uttered prior thereto."

Also the court found:

". . . But the point that I would make is that it is the Board of Regents that made the decision and I am unable to agree with counsel for the Plaintiffs that this Board of Regents or the five members thereof or the whole board, for that matter, were unaware of these things present."

And the trial court said:

". . . . [A]nd I am not at all sure that the press conference wasn't rigged for the purpose of thwarting non-renewal of their employment contracts so they could continue their activities.

"It just isn't the law that you can manufacture a first amendment right. If this was so, then all an instructor would have to do during a one year contract would be to criticize the president. Then if his contract was not renewed he would say this is because of this criticism and you must renew it, because if you don't, you violate my constitutional rights because I criticized you and because I criticized you, that has to be the reason why you don't renew. This is ridiculous on its face, certainly it can't be the law.

"As I have indicated, I have to make a decision as to whether the underlying principle, basic substantial reasons for non-renewal were because freedom of speech was exercised or for other reasons. And I think the other reasons are not only predominant, but I think they were the basis of non-renewal to the exclusion of any and all other reasons."

The above findings are in accordance with the record considering the standards for appellate review. The majority opinion really does not demonstrate otherwise, but instead has set up new First Amendment requirements and has found that a failure to renew for "divisiveness" is a constitutional violation.

In our Smith v. Losee, 485 F.2d 334 (10th Cir.), the trial court made findings of fact, which were supported by

the record, that the nonrenewals were for impermissible reasons, and the issues were considered in that context. Smith v. Losee is not comparable to this case.

It is obvious that the staff and teachers of the school were divided into two factions, and the division was deep. The effectiveness of the school had become impaired whether as an effect or as a cause, but in any event there was disruption and the situation was serious. The Board of Regents and others had decided the problem was caused by the division, and the Board set about to solve it. The solution decided upon was the nonrenewal of plaintiffs' contracts. This was a drastic course, but the Board apparently felt that drastic steps were necessary. This division or related problems were apparently determined to be sufficiently serious and disruptive to necessitate the suspension of the tenure by the Board of Regents.

The school was on probation as an institution accredited by the North Central Accrediting Association, and by the group accrediting its department of education. The school was also facing a decline in enrollment, and financial difficulties. The former president had left because of the problems. The North Central Association had sent a team to examine the school before the president here involved had come to the college. After he had been designated as president, the Association asked him and some of his staff to meet with them in Chicago. This was done, and according to the testimony of the president, they told him there:

"They simply said that you are deficient in about seventeen or eighteen different areas. But the main trouble, the big trouble at the college is devisiveness within the faculty."

It is thus apparent that the school at the time here pertinent was in trouble. Seventeen deficiencies would be enough. About the only thing which had not happened was the imposition of NCAA sanctions.

With these fundamental problems to be met, the disruption and opposition by the anti-administration group must be examined under the balancing required in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811, if there are any constitutional issues raised by the proof, and this is doubtful. The balancing cannot be done in a vacuum, but in the context of these problems. The action taken by the Board of Regents must also be evaluated as the solution selected by them as an exercise of the duties imposed upon them. One group had to go; the administration decided that the anti-administration group should go. This decision does not appear to be particularly surprising, but absent constitutional prohibitions this action was within the powers of the Board.

The balancing required by Pickering, where constitutional issues are raised by the proof, is basically a matter for determination as a fact by the trial court. The trial court did so here and made findings of fact. This balancing or context requirement was imposed by the Supreme Court for just such a situation as is before us. In every case of this nature the factors, the weights on each side of the balance, are unique to that case. The force on either side is determined by the particular situation as an accumulation of all the factors.

The Court in Pickering said (391 U.S. at 568, 88 S.Ct. at 1734):

"The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

Also at page 569, 88 S.Ct. at page 1735:

". . . Because of the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors, against whom the statements are directed, to

furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged. However, in the course of evaluating the conflicting claims of First Amendment protection and the need for orderly school administration in the context of this case, we shall indicate some of the general lines along which an analysis of the controlling interests should run."

In the facts before the Court, again in Pickering, it said:

". . . The statements are in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented here."

The divisiveness referred to frequently in the record was the faculty division into two camps referred to by the accreditation examining team. The Court in the cited case had a particular statement to place in context; here we have only the general tone or attitude as described above. This makes it difficult to see anything except the impact upon the school of the division of the faculty.

This is not an instance of disruption by demonstration, riots, and fires, but of a different kind, also with serious consequences. The examining teams found this to be the most serious problem. It must be significant as evidence of the effect of the plaintiffs' action or inaction upon the operation of the school. We don't have to decide which group was right. The Board of Regents had the authority to take a position and to carry out its decision, and this it did within constitutional limitations.

I would affirm the judgment of the district court.

LEWIS, Chief Judge (dissenting):

Once again this court has attempted to draw a legal fence line between the right of a teacher to exercise valid expression under the first amendment and the right of a sovereign state to operate a college in a manner in which its elected and appointed officials think will best serve its state interests. But to draw such a fence line is difficult, if not impossible, for surely it must meander with considerable flexibility and accommodation. The majority has, however, apparently agreed to a straight line allowing totally unrestricted academic speech, has protected it with barbed wire and words, and has left the state entangled. I cannot agree and must dissent for the exigencies of the case we here consider dramatically indicate, to me, a different boundary.

I am in complete accord with my Brother Seth's views in dissent. Here was a college strangling in the administrative tape of discord and disruption termed by an independent analyst as faculty divisiveness. This imbalance was a continuing one with the interest of the state in an efficient college approaching, and rapidly, an absolute zero. Faced with this dilemma the majority is convinced that the Board of Regents, and particularly the president, simply but unconstitutionally imposed a subjective will upon the plaintiffs. To me, this rationale and the reasoning of the majority opinion consists of imposing original and appellate findings and conclusions, perhaps allowable by the record but in no way so dictated, and in direct contradiction of the factual determination of the trial court. The term divisiveness found by the trial court to premise the subject discharges describes and includes in part the discordant efforts of the plaintiffs to impose *their* subjective views upon the operation of the college. My Brother Seth summarizes the case well when he states: "The Board of Regents had the authority to take a position and to carry out its decision, and this it did within constitutional limitations."

BARRETT, Circuit Judge (dissenting):

I respectfully dissent.

## I.

The court lends the impression that the Complaint, together with the evidence presented and the arguments advanced by Rampey, et al., at trial, raised issues of First Amendment rights of free speech beyond the April 24, 1973 press conference. Such is not supported by the record. The *sole* and *only* First Amendment issue presented and urged by the 14 *at trial and on appeal related exclusively to the press conference.* The trial court's findings confirm that the press conference remarks raised the *only* First Amendment issue for specific trial determination:

To me, the evidence is quite convincing that Dr. Carter had intended not to recommend thirteen of the fourteen prior to the press conference. To me, the testimony of Annette Black cinches this point. She struck me as telling the unquestioned truth. She typed the list before the press conference. It was Dr. Carter's list. Dr. Carter, prior to the press conference, had singled out at least thirteen of the fourteen for non-renewal . . . I think the independent study list, sometimes referred to in the trial as the execution list . . . played a significant part in the atmosphere of whether or not contracts were going to be renewed.

(R., Appendix Vol. 3, Supp. to Appendix, p. 565).

It just isn't the law that you can manufacture a First Amendment right. If this was so, then all an instructor would have to do during a one-year contract would be to criticize the president. Then if his contract was not renewed he would say this is because of this criticism and you must renew it, because if you don't you violate my constitutional right . . . this is ridiculous on its face. . .

(R., Appendix Vol. 3, Supp. to Appendix, pp. 568–569).

Appellants' Complaint alleges *solely* that non-renewal of their contracts of employment was in reprisal for exercise of their free speech rights arising out of the April 24, 1973 press conference " . . . because they exercised their right of freedom of speech and expression in criticizing defendants and disagreeing with their policies." *See* paragraphs 10, 11 and 13 of the Complaint (Appendix, Vol. I, pp. 7–8). The court incorrectly observes that while the 14 were "originally" of the belief that "the press conference had been the cause of their having been fired" that they later changed their belief. This finds no support in the record. *We have, in my opinion, reversed the judgment of the Trial Court on grounds not pled or relied upon in Plaintiffs-Appellants' Complaint or urged or argued either at trial or before this court on appeal.*

While First Amendment questions of "constitutional fact" have been held justification for appellate de novo review, Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), still such is permitted only under exceptional circumstances in order to prevent manifest injustice, and then *only* if properly presented for judicial determination. Gomes v. Williams, 420 F.2d 1364 (10th Cir. 1970). Issues not raised and presented for trial court determination are not to be considered on appeal except in order to prevent manifest injustice. Eureka-Carlisle Company v. Rottman, 398 F.2d 1015 (10th Cir. 1968); Schenfeld v. Norton Company, 391 F.2d 420 (10th Cir. 1968); Justheim Petroleum Company v. Hammond, 227 F.2d 629 (10th Cir. 1955); State ex rel. Williams v. Neustadt, 149 F.2d 143 (10th Cir. 1945). Trial court findings may not be set aside on appeal unless they are found to be clearly erroneous. *See* Arnold v. United States, 432 F.2d 871 (10th Cir. 1970), and cases cited therein.

The court does not come to grips with the fact that the Trial Court's findings and conclusions *are not* clearly erroneous based upon the only First Amendment issue pleaded and presented in an evidentiary sense by Rampey, et al., and urged and argued at trial and on appeal, i. e.,

that their contracts were not renewed because of the exercise of their First Amendment rights at the *press conference*. Rule 52, Fed.R.Civ.P.—the clearly erroneous rule—applies with equal force in cases involving constitutional rights. Williams v. Eaton, 468 F.2d 1079 (10th Cir. 1972). Nothing except our de novo "findings" of fact can be relied upon to justify the invocation of the manifest injustice rule. Significantly, during en banc argument, counsel for the appellants acknowledged that each of the 14 had obtained employment positions in the fall of 1973 comparable to those they held at O. C. L. A.

In Schenfeld v. Norton Company, *supra*, Judge Murrah, speaking for this Court, said ". . . ordinarily a claimant cannot expect to lose in the trial court on one theory and win on appeal under another." 391 F.2d at 424. *See* also United States v. Gates, 376 F.2d 65 (10th Cir. 1967), Hidden Splendor Mining Company v. General Insurance Company of America, 370 F.2d 515 (10th Cir. 1966).

While an appellate court may *affirm* a trial court judgment on a basis not relied upon, Pound v. Insurance Company of North America, 439 F.2d 1059 (10th Cir. 1971), it is not called upon to decide whether the trial court reached the correct conclusion of law, but only whether it reached a permissible conclusion in light of the evidence, even though it be in sharp conflict. Hodgson v. Okada, 472 F.2d 965 (10th Cir. 1973).

The court, on this appeal, has made controlling inferences which the Trial Court did not make, and has directed judgment on an independent basis neither pled, urged or argued either at trial or on appeal, violative of the commands of Zenith Corp. v. Hazeltine, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). It is not the function of the court of appeals to infer material facts, nor may it make controlling inferences which the trial court did not make. Hodgson v. Okada, *supra*. Where different inferences may be drawn, appel-

late courts will not substitute their judgment for that of the trial courts. Colby v. Cities Service Oil Company, 254 F.2d 665 (10th Cir. 1958). The jury— or the court if tried without a jury—has the *exclusive* function of observing the witnesses, appraising their credibility, determining the weight to be given their testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and of reaching ultimate conclusions of fact. Loew's, Inc. v. Cinema Amusements, 210 F.2d 86 (10th Cir. 1954).

The resolution of conflicting evidence is particularly within the province of the trial court. Marken v. Goodall, 478 F.2d 1052 (10th Cir. 1973); Davis v. Cities Service Oil Company, 420 F.2d 1278 (10th Cir. 1970). The appellate court must view the evidence in the light most favorable to the prevailing party and must affirm unless the trial court findings and conclusions are clearly erroneous. Maloney-Crawford Tank Corporation v. Sauder Tank Company, 465 F. 2d 1356 (10th Cir. 1972); Scaramucci v. Dresser Industries, Inc., 427 F.2d 1309 (10th Cir. 1970). We have here usurped prerogatives exclusively vested in the trial court. And we reverse on grounds which I believe to be based upon conjecture, guess and speculation, which we have consistently condemned. Tyrrell v. Dobbs Investment Co., 337 F.2d 761 (10th Cir. 1964); Waters v. National Life & Accident Ins. Co., 156 F.2d 470 (10th Cir. 1946).

## II.

The central dispute submitted was entirely factual. Following the two-day trial, the Trial Court held that the nonrenewal of the 14 contracts of employment by the Board of Regents on April 26, 1973, was not the result of reprisal against the 14 for having exercised First Amendment rights at the April 24, 1973 press conference, and that their contracts were not renewed for constitutionally valid reasons. The Court further held: (1) that appellant Rampey is entitled to a hearing to determine

whether there exists sufficient legal cause for the non-renewal of his contract, in view of the fact that he had achieved tenure status prior to April 26, and was, accordingly, entitled to a prior hearing with reasons furnished as to why his contract of employment should not be renewed; (2) that it abstained from a determination as to any issue of Oklahoma law relating to alleged permanent tenure status of instructional personnel at the college by reason of the ambiguity and lack of clarity of said law; and (3) with respect to three administrative personnel-appellants—Ledgerwood, Bolton and Jeffers—that Oklahoma law did not entitle them to a prior hearing, in light of the finding that such a hearing is effective only in normal situations and that the situation during the period involved was not normal. These findings are not erroneous. All are supported by substantial evidence. The court applies the clearly erroneous rule on grounds which were never urged, presented, argued or considered at trial, and which are not supported by substantial evidence. Further, the court makes many references to "termination" of the contracts and "firings", neither of which are proper. The contracts were not terminated. There were no "firings." This was a case involving *non-renewal* of contracts of employment in which none of the appellants, save Rampey, had any property interest. Some additional factual background is required in order to appreciate the correctness of the Trial Court's judgment.

The Oklahoma College for Women was converted to O. C. L. A. in 1965. The State Regents for Higher Education determined that it should become a coeducational, innovative liberal arts college with selective enrollment standards. The implementation of these goals led to major differences on the campus. The administration of the college changed frequently from 1965 onward. Serious splits occurred among faculty—administrative personnel—some 55 in all when Dr. Carter came on board—and various divisions cropped up on the campus, in-

cluding major divisions within the faculty. These differences spilled over and resulted in groups of students allying themselves with various factions. The polarization was so deep that Dr. Carter's predecessor resigned as president in the spring of 1972, and the college was placed on academic probation by the N. C.A. and the N. C. A. T. E.

Prior thereto—in May of 1972—the Board of Regents revoked the tenure policy. *All of the appellants were immediately aware of this action. If they believed prior thereto that they would achieve tenure, as indicated in the majority opinion, the record is clear that none of them voiced any objection with the Board of Regents, or otherwise challenged the action until the instant suit was filed—a lapse of over one year!* Yet, by innuendo, the court hangs the tenure "hat" on a rack that simply is not supported by this record. This is done, notwithstanding the explicit finding of the Trial Court that it abstain from a determination of the tenure issue because the Oklahoma law is ambiguous and unclear.

Dr. Klotsche, hired by the Board as a consultant, submitted three reports. The first report was made in November of 1972, just two months after the first school academic term had commenced under Dr. Carter's presidency. During that short period of time Dr. Carter was proceeding quietly and deliberately in an attempt to become acquainted with the problems of the college. He could not have been responsible for any of the discordance on the campus reflected by that report, which stated that the campus was deeply polarized with sharp divisions among the faculty and students over program directions and that there was *widespread distrust and suspicion.* The report also noted that tenure had been terminated and that morale was low.

In January of 1973, Dr. Klotsche's second report noted that communications across factional lines were virtually non-existent, that dissension was clearly

visible, and that the campus situation was critical. He made numerous general recommendations. In his final report of April, 1973, he stated that no appreciable gains had been made and that no significant steps had been taken to bring the college back to appropriate governance with the roles of faculty, administration and regents clearly defined; *and that an air of uneasiness pervaded the campus because the administration intended to recommend nonretention of a number of faculty members at the April 26th meeting of the Board.*

Over the years the college had established the practice of releasing the names of faculty members who would be on the "five-week independent study" list or the "ten-week independent study" list. These lists were published just a day or so before the 14 met for the first of some five secret sessions with their retained attorney in preparation for their press conference demands. The "five-week list" corresponded with the end of the regular academic year. The "ten-week list" meant that those faculty members would teach into the summer term and, almost without exception, be re-employed for the next ensuing academic year. Dr. Carter testified that over the years the five-week list had become known as the "execution" list. Appellant Leroy W. Rampey, who had been at the college in excess of ten years, testified that he was "nervous" about the fact that his name was on that list and that this "certainly" did influence his decision to participate in the press conference. Dr. Carter stated that he placed the names of eleven of the appellants on the list because they were divisive and made no effort to cooperate with him, including their failure to consult or contact him. Dr. Ward testified that he had received word from Dr. Carter that some of the faculty on the list would not be rehired.

Soon after their first secret meeting with their hired counsel—within a day or two after the study lists were made known—the 14 inquired of him and were advised of free speech rights of faculty and administrative personnel announced in Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). *Their press conference was held shortly after the five weeks expired and only two days before the Board of Regents meeting when the names of those faculty—administrative personnel to be employed for the academic year 1973–1974 were released.*

The following demands were made by the 14 for *the very first time* at the press conference held in Oklahoma City in order to obtain broader news media coverage: that Dr. Carter and Dr. Feree resign immediately; that *each of the* members of the Board of Regents resign and that new members be appointed; that "interference" from the Governor's office be severely restricted; and that Dr. Klotsche's recommendations be followed. Expressing their concern for the low student pre-enrollment and lack of adequate internal grievance procedures, they rested their case for campus solutions on implementing Dr. Klotsche's general recommendations! But they had more to say. They pledged themselves to: (1) cause the circulation of a Grand Jury Petition to investigate violations of the open meeting law and "certain expenditures" made at the college; (2) to file a complaint with the American Association of University Professors for an investigation into attempts by "some administrative personnel" to deliberately set faculty members against one another; (3) to file a complaint with the Department of H. E. W. alleging that certain government regulations with reference to publication of job vacancies had not been complied with; (4) to file a lawsuit in federal court to resolve the issue of tenure; and (5) to bring to the attention of the State Board of Regents for Higher Education certain highly irregular recruiting tactics.

The press conference statement was signed by the 14 appellants. Two days later the Board of Regents met and re-

leased a list containing the names of those faculty—administrative personnel to be rehired by the college for the next academic school year, a list prepared by Dr. Carter and typed by Annette Black well in advance of the press conference. The names of none of the appellants appeared on the list. Dr. Carter testified that Dr. Ward's name had been crossed off of the list on the morning of the Board of Regents meeting because he had joined the 13 whom he referred to as dissidents in participating in the press conference, and that this convinced him that Dr. Ward would not cooperate with his administration.

### III.

We have previously observed that the court, by strong innuendo, infers that each of the 14 were tenured and that— by necessary implication—they were denied certain due process rights incident to state tenure statutes, i. e., notice of cause for termination and/or non-renewal, impartial administrative hearing and right to appeal to the state courts. We do not decide here whether the causes testified to by Dr. Carter and others would "hold water" in the sense of a tenure statutory challenge. That, after all, is a matter exclusively within the domain of the sovereign State of Oklahoma. In any event, we know from this record that the *only federal constitutional rights* issue which the appellants would have raised in such a hearing is that directed to alleged reprisals for exercising protected First Amendment speech *at the press conference*. Notwithstanding these facts, the court makes no reference to the Trial Court's determination to abstain from a decision on the tenure issue relating to faculty personnel because of the ambiguity and lack of clarity in the Oklahoma statutes. Having abstained, the Trial Court was then *only* concerned with issues involving denial of federally protected constitutional rights. Having found—and I believe quite properly so—against Rampey, et al., on their contention that their contracts were not renewed by reason of their press conference criticisms, the non-retention of the 14 was not a denial of "liberty" or "property" interests and there were no charges or stigmas against them foreclosing other employment. Board of Regents v. Roth, 408 U.S. at 573, 92 S.Ct. 2701.

On appeal we appear to "grant" tenure to 13 of the appellants and to retry the case on a de novo basis involving deprivation of civil rights, "finding" a most subjective First Amendment liberty: freedom from Dr. Carter's "personality control" in his purported attempts to require the 14 to: (a) "conform to the image of the president"; (b) cease activities which he saw as a "threat" to his presidency; (c) cease "disagreements" with him in areas where Carter "does not tolerate disagreement"; and (d) "conform" to his "patterns" and "molds". If these grounds have substance, the avenue for their redress is, in my opinion, exclusively within the jurisdiction of the sovereign State of Oklahoma. They do not rise to *any* federal constitutional protections under the First Amendment.

With further reference to the Trial Court's decision that it should abstain from a determination of the tenure issue interpretive of Oklahoma law, we here ignore our rule that such a determination by a district judge who is a resident of the state where the controversy arose carries *extraordinary persuasive force on appeal*. Stafos v. Jarvis, 477 F.2d 369 (10th Cir. 1973), cert. denied, 414 U.S. 944, 94 S.Ct. 230, 38 L.Ed.2d 168 (1973); Hardberger and Smylie v. Employers Mutual Liability Insurance Company of Wisconsin, 444 F.2d 1318 (10th Cir. 1971); Hamblin v. Mountain States Telephone and Telegraph Company, 271 F.2d 562 (10th Cir. 1959). Furthermore, we have failed to give proper deference to the resident Federal Trial Judge's expertise and judgment on the subject of local law. Binkley v. Manufacturers Life Insurance Company, 471 F.2d 889 (10th Cir. 1973), cert. denied, 414 U.S. 877, 94 S.Ct. 130, 38 L.Ed.2d 122 (1973).

Of equal import, abstention under the circumstances of this case would be in keeping with the promotion of proper Federal-State relations in the interest of sound judicial administration and in recognition of the principles of comity. This, I submit, is particularly appropriate in the case at bar. By abstention we would: (1) avoid needless conflict with the state in the administration of its own affairs, [Alabama Public Service Commission v. Southern Railway Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951), Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971)]; (2) leave to the State of Oklahoma the resolution of serious unsettled questions of state law, [Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); Trigg v. Moseley, 433 F.2d 364 (10th Cir. 1970); Lewis v. State of New Mexico, 423 F.2d 1048 (10th Cir. 1970)]; (3) permit the state authorities charged with the management, control and operation of their educational institutions the opportunity to judge the merits of this dispute, taking into account the abusive and insulting remarks made by the 14 at the press conference.

### IV.

Some matters in the record have not, in my judgment, been accorded the significance relied upon by the Trial Court. They are: (1) Soon after the 14 first met with their retained counsel they inquired of and were advised of the free speech First Amendment rights of faculty announced in Board of Regents v. Roth, *supra,* and Perry v. Sindermann, *supra;* (2) the 14 understood the significance of the placement of 11 of their group—a so-called core curriculum group—on the "five-week independent study list", i. e., that in all likelihood, based upon prior experience, the contracts of those on the list would not be renewed for the next academic year; (3) Dr. Carter testified that the "five-week" list was known on the campus as the "execution" list; (4) appellant Rampey testified that he was certainly "nervous" about the fact that his name was on the list and that this "certainly" did influence his decision to participate in the press conference; and (5) *that none of the 14 voiced any of their objections, views, demands or recommendations made by them at the press conference at any time previous thereto to Dr. Carter, Dr. Feree, any of the college administrators or any members of the Board of Regents.*

### V.

I see much similarity between the trial court's opinion in the case at bar and the opinion of this Court in Fisher v. Walker, 464 F.2d 1147 (10th Cir. 1972). Fisher, a fireman, circulated sharp and false written criticism of his immediate supervisors, and the immediate supervisors of most of the members of the Union of which he served as president, thereby creating a volatile, divisive and disruptive atmosphere within the department. Unlike the case at bar, Fisher was suspended from the department *precisely because of the criticisms voiced* and his unwillingness to meet with the city's fire chief and other officers in an effort to resolve any problems. We there observed that the right of a teacher to voice criticism of the school board's fiscal policies in favor of athletics, which was held to be a protected First Amendment right in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), does not apply to an enormous variety of fact situations in which critical statements by teachers and other public employees cannot be protected under the First Amendment umbrella. We took notice of footnote 3 in the *Pickering* opinion:

> Likewise, positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them can also be imagined. 391 U.S. 563 at 570, 88 S.Ct. 1731 at 1735.

I believe that in view of the fact that the Oklahoma legislature has vested in the President and Board of Regents the obligation to manage, operate and control the college—*with the attendant grant of broad discretionary authority* —that all who serve under them bear a heavy obligation *to relate and to cooperate* in all matters which they believe should either be altered, terminated or initiated for the good of the college, even though in doing so they may find it necessary to be critical of and in opposition to the views of their superiors. Instead of pursuing that route, the 14 chose the surreptitious route of meetings leading to the press conference, which lent absolutely nothing concrete in terms of specific corrective recommendations for the benefit of the college, but did, because of the venomous criticisms voiced, create the very undermining of the working relationship between superior-subordinate referred to in *Pickering, supra.* In reversing the trial court judgment we have placed our "stamp of approval" on the actions of the 14 and have, in effect, mandated upon school authorities the obligation to renew contracts of those who publicly criticize them, out of fear that by failing to do so they shall subject themselves to ridicule and the results wrought by this lawsuit and, perhaps worse yet, the likelihood of personal money judgment awards against them. *See* Smith v. Losee, 485 F.2d 334 (10th Cir. 1973), U.S. App. Pndg.

Instead of addressing ourselves almost exclusively to the tenuous "facts" somehow found in this record, relied upon to condemn President Carter's so-called demands termed "personal and subjective on his part", to-wit, that the 14 "conform" to his "patterns" and "molds", we should ask: How many persons will be willing to serve in the future in the capacities of the appellees under the restraints and risks we have here imposed? We cannot pretend that the same quantum of proof, held to support reversal of the trial court judgment here, thus mandating the grant of injunctive and declaratory relief sought in the Complaint, may not likewise support damage judgment awards against the appellees. *See* Smith v. Losee, *supra.*

The right of free speech is not absolute at all times and under all circumstances. Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). And it has long been recognized that some forms of expression are not entitled to any protection under the First Amendment, even though they could reasonably be thought to be protected under its literal language. Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). It is well established that even protected speech may be subject to reasonable limitation when important countervailing interests are involved. I believe that we have violated the admonishment in United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), where the Supreme Court said:

> We cannot accept the view that an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea.

391 U.S. at 376, 88 S.Ct. at 1678.

A board of education and authorized administrators must apply both objective and subjective tests and factors in the area of teacher employment, termination or dismissal. Hetrick v. Martin, 480 F.2d 705 (6th Cir. 1973), cert. denied, 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482 (1974); Moore v. Board of Education of Chidester School District No. 59, Chidester, Arkansas, 448 F.2d 709 (8th Cir. 1971). In Duke v. North Texas State University, 469 F.2d 829 (5th Cir. 1972), cert. denied, 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973), the dismissal of a teacher with an expectancy of re-employment was upheld because the teacher used profane language in speeches critical of the university policies. The administrators were held harmless on the ground that their action was justified in an effort to maintain a competent faculty and to perpetuate public confidence in the university.

## VI.

The case at bar *is not* Smith v. Losee, *supra,* revisited. This is so because of several critically distinguishing aspects.

First, in the instant case, unlike *Smith,* the material facts are sharply and critically in dispute going to proof of the fundamental basis of the action, i. e., whether the exercise of free speech First Amendment rights at the press conference played any part whatsoever, except for the participation of Dr. Ward, in the contract non-renewals. In *Smith* there were few factual disputes.

Second, in *Smith* we held that a teacher asserting that he has not been rehired for constitutionally impermissible reasons has the burden of proving that he was dismissed for the exercise of constitutional rights. Only when that burden has been met does the burden of proof shift to the defendants, to show by clear and convincing evidence that the contract nonrenewal did not come about because the teacher exercised those protected rights, but for reasons unrelated thereto.

The clear distinctions between the case at bar and Smith v. Losee, *supra,* are: (1) here the plaintiffs-appellants *have not* carried the burden of proof required of them; and (2) here the trial court's findings and conclusions are based upon reasons for non-renewal of the faculty—administrative contracts which are in nowise constitutionally invalid.

## VII.

The prevailing opinion does not mention that authorities—administrators and boards—have historically been clothed with *broad discretion* in areas involving employment. My dissent in Smith v. Losee, *supra,* details my deep concern that the faculty of our educational institutions will be calling "all of the shots" from top to bottom, by reason of the liabilities we have attached to actions which cannot be *malicious* in character. I stated in Smith v. Losee, *supra,* and repeat here, that where acts of school officials—administrators and board members—are *discretionary* in nature—as distinguished from those which are *ministerial* in nature—they are immune from any court judgment *so long as the acts are done without malice.*

Our instant decision is the more puzzling in light of recent opinions of the Supreme Court in Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and Letter Carriers v. Austin, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974), which reaffirmed the rule laid down in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). There the Supreme Court announced a constitutional privilege freeing the news media from common law defamation liability resulting from criticism of public officials predicated upon the " . . . federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was true or not." 376 U.S. at 279–280, 84 S.Ct. at 726. The majority opinion does not discuss what, if *any,* privilege those officials, charged by state laws to undertake the heavy and vexing obligations involved in the management, operation and control of our complex educational system, are entitled to. By ignoring the issue we may have led these dedicated and sincere public officials to believe that their "discretion" is meaningless.

By analogy, I observe that First Amendment challenges to statutes and regulations on the basis that they are "overbroad" and "vague" have not fared well in recent Supreme Court decisions. In Parker, Warden v. Levy, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), the Court rejected the "void for vagueness" challenge under the Due Process Clause of the Fifth Amendment, and the "overbroad" challenge under the First Amendment, by upholding a general courts-martial conviction under Art. 133

which prescribes punishment for an officer for "conduct unbecoming an officer and gentleman", and Art. 134 which punishes, inter alia, "all disorders and neglects to the prejudice of good order and discipline in the armed forces." See also Secretary of Navy v. Avrech, —— U.S. ——, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974), involving conviction on charges of publishing a statement "with design to promote disloyalty and disaffection among the troops"; Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969). Thus, while the United States Supreme Court is reversing the trend of striking down statutes and regulations challenged on First Amendment grounds as overbroad and/or vague, we seem to be travelling in the opposite direction by condemning new-found subjective restraints on ill-defined and hazy First Amendment rights.

That there exists some inequality in a school system is not sufficient to justify intervention by the federal judiciary in its management. It is only where state action impinges on the exercise of fundamental constitutional rights or liberties that the federal courts may interfere with a state's dedication to local control of education; the judiciary is not designed to operate and manage schools. New Rider v. Board of Education of Independent School District No. 1, Pawnee County, Oklahoma, 480 F.2d 693 (10th Cir. 1973).

In Pickering v. Board of Education, *supra,* the Court stated:

> The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

391 U.S. at 568, 88 S.Ct. at 1735.

Just as it upheld a college president's subjective conclusion that a particular campus organization should be denied official campus recognition because the group would be a "disruptive influence", Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), the Supreme Court recently rejected challenges to 5 U.S.C. § 7501(a) of the civil service code, which authorized removal or suspension without pay *"for such cause as will promote the efficiency of the service",* as unconstitutional on the basis of being overbroad and vague. Arnett, Director, Office of Economic Opportunity, et al. v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). These decisions are in harmony with the reasoning contained in Hetrick v. Martin, *supra,* to the effect that the school administration may refuse to renew a teacher's contract because of displeasure with his or her "pedagogical attitudes", involving reasons completely subjective in nature. Fitness for teaching rests upon a broad range of factors, many of which are tested largely by subjective analysis. These include personality attitudes toward administrators, fellow teachers and students, personal appearance, demeanor, dress, ability or willingness to communicate, philosophical attitudes and general character traits.

The judiciary must be ever alert not to be drawn into nonjusticiable political questions over which it has no jurisdiction. While justiciability is not a legal concept with a fixed content or susceptible to scientific verification, Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), we must be ever mindful that the true nature of the questions propounded for judicial resolution are not in fact subjects committed solely to the political branches of government. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). I reiterate views expressed in my dissent in Smith v. Losee, *supra,* i.e., that school administrators and members of boards of education are not absolutely immune from suit, but that I would hold them liable only for discretionary acts performed in a malicious manner—in reckless and wanton disregard for the known rights of others. Persons acting so abusively

are not entitled to any immunity or privilege. If their other actions—including those attributed by the Court to Dr. Carter—are deemed by state authorities to be contrary to the best interest of the students and the institution, state officials are perfectly capable of policing their internal affairs.

It is unreal to expect school administrators and boards charged with a wide range of statutory obligations—*almost entirely discretionary in nature*—to discard subjective reasoning. By stripping such officials of their authority and by exposing them to judgments, including personal damage judgments, it is logical to ask: Do administrators and boards of education directed and empowered by state law to govern, manage and control educational institutions retain any such authority, or do the faculty of those institutions now, in practical effect, control and operate them by federal court fiat?

I would affirm the trial court.