Don M. SCHMIDT, Plaintiff,

v.

FREMONT COUNTY SCHOOL DISTRICT NO. 25, STATE OF WYOMING, et al., Defendants.

No. C74–163.

United States District Court,
D. Wyoming.

Jan. 21, 1976.

Graves & Hacker, Cheyenne, Wyo., for plaintiff.

Murane, Bostwick, McDaniel, Scott, Greenlee & Owens, Casper, Wyo., for defendants.

*Judge's Memorandum*

BRIMMER, District Judge.

Plaintiff, a former high school principal who was a nontenured "initial contract teacher" as defined by the Wyoming Education Code (Sec. 21.1–152, Wyoming Statutes, 1957), brings this action under 42 U.S.C. Section 1983 against the Fremont County School District No. 25 and individually against the school board members in their official capacity and against the former superintendent of schools, James H. Moore, as the chief executive officer of the board. Plaintiff claims that the defendant board's nonrenewal of his contract as principal of the high school in Riverton, Wyoming was a denial of his constitutional rights of free speech and due process under the First and Fourteenth Amendments to the Constitution, because the real reason for the defendants' decision was the plaintiff's having been outspoken principally on how football tickets sales should be conducted and on his views of the organization and administration of the school's career education program.

Jurisdiction is founded on 28 U.S.C. Section 1343(3) and (4). The case was tried without a jury.

*Findings of Fact*

The defendant Board of Trustees of Fremont County School District No. 25, acting on the recommendation of its superintendent of schools, the defendant Moore, on January 28, 1975 voted 5–1 not to renew the contract of the plaintiff as principal of the Riverton High School in Riverton, Wyoming for the 1974–1975 academic year. The plaintiff had served the education profession with distinction in various capacities in Wyoming and Minnesota, and was principal of the Riverton High School for the 1972–73 and 1973–74 academic years. He is a well-qualified, conscientious and capable administrator, with a good record.

The plaintiff commenced work as senior high school principal in July, 1972 at a salary of $15,800.00. In January, 1973 his contract was renewed for the 1973–1974 year at a salary of $17,069.00. On January 14, 1974 the defendant Board of Trustees held an executive meeting at which the defendant Moore was present. The Board discussed renewal of the plaintiff's contract and the Board members disclosed to each other their positions on renewal. Plaintiff received first notice of this on January 22, 1974 when defendant Moore told him that he was not going to recommend renewal of his contract. The plaintiff was allowed to appear before the Board on January 28, 1974 and informally discussed the non-renewal of his contract with the Board, after which the vote was taken not to renew it. The plaintiff was formally notified in writing of the non-renewal of his contract on January 29, 1974. The plaintiff filled out the balance of his contract year.

The general reasons given by the defendant Board members for non-renewal of plaintiff's contract were that he had not come up to the Board's expectations, that Board members were disappointed with his performance, that it was in the best interests of the school to seek stronger leadership, that the Board lacked confidence in him, that the Board felt that rather than place plaintiff on a tenure status by hiring him a third year there were other people more able to fill the job. These conclusions were based on a variety of grounds, such as tactless and unprofessional comments about a fellow administrator and the school system at a board meeting, the plaintiff's appearance at a board meeting to oppose a board policy on reserved seating at football games and his subsequent lack of cooperation in implementing it, lack of a strong program to prevent student absenteeism and to improve attendance, his failure to recommend non-renewal of the assistant principal's contract in January, 1973, his suspected failure to make teacher evaluations because of his turning in evaluation sheets unsigned by the teacher, his lack of rapport with the students, an altercation with the football coach, and disagreement over the handling of the case of a student who was harmed as a police informer by fellow students.

A detailed examination of the facts is required in order to evaluate these reasons for non-renewal of his contract. Just before the plaintiff commenced work the defendant school district had gone through a tumultuous period of disruption and discord, in which student absenteeism was high, the school had a high drop-out rate, sanctions had been imposed upon it by the Wyoming Education Association, the high school principal had been ousted from that position, the next principal lasted only a few days, and a successor, who had then filled out the term, declined to accept the job again. During the period of plaintiff's employment, the defendant Moore, who had worked in the school district for 30 years, was not in the best of health and later resigned without notice on April 3, 1974 because of his poor physical condition, which also prevented him from appearing at the trial.

The plaintiff was told upon his initial employment that there was a widening split between the career education program headed by another co-equal principal and the high school academic program and that his job was to "pull it all together". However, almost from the

first, problems arose, owing to the co-equal principalships of the high school and career education program, in areas such as credits for graduation, presentation of new programs to the board, and obtaining transcripts for teachers for North Central Association rating purposes. However, when the plaintiff sought guidance and direction from the defendant Moore and the assistant superintendent, he was merely told that the dual-headed system was how the program had been operated and he was encouraged by Moore to take it up with the board. The existence of strong opinions on this subject by the holdover board members was not disclosed to him. The plaintiff obtained an executive session of the board to discuss coordination of these two programs, but when he presented his views that the career education director should be an assistant principal, he met strong resistance. One board member said that it would be a "cold day in Hell" when that happened, and questioned his qualifications to administer such a vocational program. A heated exchange then ensued, in which the superintendent who had encouraged the session took no part, and in the course of it voices were raised, strident comments were made, and plaintiff referred to the school as a "rag-tag high school", and also was so critical of his counterpart, the career education director, that an apology was afterwards tendered by the plaintiff to him. The tone of this argument surprised, shocked and offended some of the board members, giving them an impression that plaintiff was not entirely professional and undermined their confidence in him. He was permitted to say what he wished to, but in so doing he hurt his image in the board's eyes.

Plaintiff learned soon after starting his work in 1972 that the board had let parents of the members of the athletics letter club sell reserved seats to the high school football games, a policy that he felt led to poor public relations, administration problems, and required additional police protection at the games. He was told by the superintendent that the board's decision on this policy was not final and was encouraged by the defendant Moore to discuss it with the board. He did so and the board later decided contrary to plaintiff's views. The plaintiff was not fully advised of subsequent developments on this issue by the superintendent, but after having been told by the superintendent that the letter club would sell reserved seats in the fall of 1973, there ensued a further confrontation with the football coach, in front of some of the students, for which the plaintiff later apologized. The plaintiff was obstinate in his opposition to the policy, felt that the reserved seat section was not his responsibility, and failed to provide adequate policing at the 1973 games, from which the board members concluded that there was a lack of cooperation by him in implementing its policies.

The board members were concerned about student absenteeism from classes when plaintiff was hired. They wanted a vigorous program to reduce absences from class. The plaintiff delegated responsibility for this program to the assistant principal, who had served in that position for 13 years prior to plaintiff's employment. Absences from class continued on about the same level, roll was not always taken, attendance slips were not always collected, and the principal's office did not always check on absentees with their parents nor did the teachers, and attendance records were not kept properly. Individual board members received complaints from parents concerning the truancy of their children. When he recommended renewal of the assistant principal's contract, some board members were quite disappointed in plaintiff for doing so, but kept silent on their disagreement. The plaintiff received no help from the superintendent, who was by board policy charged as its chief executive officer with supervising the entire school operation and carrying out board policy, including its policy on absenteeism, but the superintendent never discussed the absentee program with plain-

tiff except at the start when he told plaintiff there was such a problem, and although he knew the board was critical of continuance of the assistant principal in that position, he did not tell that to the plaintiff. Instead he took the position that the assistant principal was plaintiff's problem, not his. The plaintiff asked the superintendent for a board meeting to discuss attendance and to obtain guidance, but it was never granted.

However, the board chairman did tell plaintiff in January, 1973 that if attendance did not improve, he would vote not to renew plaintiff's contract. Despite this warning and others, the plaintiff continued his delegation of responsibility for the attendance problem to his assistant and there was very little if any, improvement in the rate of truancy. This was one of the board's chief reasons for non-renewal of plaintiff's contract.

A student who was arrested in the fall of 1973 for narcotics possession told the police the name of the person who had sold it to him, and thereafter derogatory signs about him were found in the high school and the student was physically beaten so that his parents feared for his safety. He had to be placed in another school and the board was asked to pay his tuition there. Board members felt that plaintiff had not handled this situation properly, because the victim was forced to leave school and the malefactors were not. The plaintiff did admonish those who had written the signs but because the victim refused to identify his assailants, plaintiff could not punish them.

When plaintiff appeared informally on January 28, 1974 to discuss non-renewal of his contract, he and his attorney requested a formal hearing, which the board on advice of its attorney refused. He was there confronted with a further ground for non-renewal, which was that the superintendent believed that he had not made required teacher evaluations because the evaluation sheets handed to the superintendent did not contain teachers' signatures. The plaintiff said that he had the signed sheets in his office.

This statement was apparently accepted because no one asked him to produce them. This reason for his non-renewal was a trivial, insubstantial after-thought, because it had not been mentioned at the prior executive meeting of the board or by the superintendent, and the latter had previously accepted from plaintiff the unsigned evaluation sheets without comment or objection.

The total effect of these events was that the board's confidence in the plaintiff as a strong administrator was undermined. Some members judged that he was running a "loose ship". When students meeting plaintiff in the hallways on board inspection trips didn't seem to know him, board members contended that he was not in contact with the student body. All of these events undermined the board's confidence in plaintiff, and when it came time to renew his contract, they accepted the superintendent's recommendation and decided that they could get a better man who would provide the stronger leadership that they desired.

The plaintiff found himself in a difficult situation which stemmed in a large degree from the ineffectiveness of the board's superintendent, who doubtless because of his health was not fulfilling his proper function and who gave plaintiff very little or no help or support or even criticism. At no time did the superintendent give the plaintiff any warning or indication that his performance was less than satisfactory, so that plaintiff could correct it. Even in recommending non-renewal of plaintiff's contract, the superintendent seemed to base his action on the board's lack of confidence in plaintiff rather than specifying any shortcoming or other reasons.

■ However, I cannot find that non-renewal of the plaintiff's contract was in retaliation for his having spoken out on his position on the career education system or the reserved football game seats. The evidence in fact shows that the plaintiff was permitted to speak out and that he was heard by the board. In fact, he was rehired by the board in January

1973 after he had been very outspoken on two occasions. The facts fall short of proving that his indiscreet comments on the career education system and his outspoken attitude on reserved football game seating were the real, primary and only reasons for his termination. The evidence does show that the defendant board members did not act arbitrarily or in bad faith, and that they were not malicious or punitive in their actions and reasons for not rehiring the plaintiff. There was no mention by the superintendent nor any consideration by the board members as a basis for non-renewal of the contract of plaintiff of any of the following contentions: outspoken criticism of the administration, presentation of counter-proposals to decisions made previously by the board, expressing his professional opinion as to the manner in which the career education program should be conducted, retaliation for the exercise of any constitutionally protected rights by the plaintiff, or expressing a professional opinion as to how tickets should be sold at high school football games. The Court therefore finds that the plaintiff did not prove by a preponderance of the evidence that his contract as principal of the Riverton High School was not renewed for constitutionally impermissible reasons violative of his rights under the First and Fourteenth Amendments to the Constitution.

■ Moreover, the plaintiff for the 1974–1975 and 1975–1976 years was employed as an assistant or area superintendent by School District No. 1 in Lincoln County, Wyoming at a salary of $22,182.00 per year, which is a better position at a higher salary than the one he lost. There is not a preponderance of evidence to show that he has been damaged monetarily, and the Court finds that his claims of damages are without merit.

### Conclusions of Law

The Court holds that during the 1972–1973 and 1973–1974 academic years Fremont County School District No. 25 was a duly constituted and legally functioning school district and a body corporate under the laws of the State of Wyoming.

■ While a non-tenured teacher, or in this case, a principal, may not be terminated from employment for exercising constitutional rights of free speech, such person has the burden of proving that it was the exercise of such rights rather than other causes which resulted in his termination. *Adams v. Campbell County School Dist.*, 511 F.2d 1242 (CA 10); *Fluker v. Alabama State Board of Educ.*, 441 F.2d 201 (CA 5). In determining the constitutional rights of free speech claimed by the aggrieved person, the United States Supreme Court has stated that, "The problem . . . is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). There Justice Marshall observed that the teacher's statements were not directed toward a co-worker, and that ". . . no question of maintaining either discipline by immediate superiors or harmony among co-workers is presented here." *Id.*, p. 570, 88 S.Ct. p. 1735. In both *Smith v. Losee*, 485 F.2d 334 (CA 10, 1973) there was a specific finding, supported by substantial evidence, that the teacher's termination was a punitive reprisal for his exercise of First Amendment Rights, and in *Rampey v. Allen*, 501 F.2d 1090 (CA 10, 1974), the Court found a "substantial showing" that the aggrieved teachers were exercising First Amendment rights and that their activities were not "excessive or unduly burdensome to the school."

Also, neither *Pickering v. Board*, supra, nor *Smith v. Losee*, supra, nor *Rampey v. Allen*, supra, on which the plaintiff relies, are applicable here, because they dealt with termination for a teacher's public statements on issues of general public concern, while here the controversy concerns the regular internal oper-

ations and functions of the school itself and the relationship between administrators, which does not trigger First Amendment protection. *Rowe v. Forrester,* 368 F.Supp. 1355 (S.D.Ala., 1974).

Here, the balance goes the other way: The manner in which plaintiff criticized the career education program and its director was excessive; and his obdurate opposition to the reserved seat program at football games, when coupled with the lack of implementation of the policing of the games as well as a quarrel with the football coach for which an apology was later tendered, leads one to believe that here, unlike *Pickering,* there was a problem of "harmony among co-workers" in which the board of education had a legitimate interest. That, coupled with plaintiff's failure to improve the students' attendance, his reliance on a subordinate instead of himself in reducing absenteeism, and other complaints, legitimately led the defendant board and its superintendent to the conclusion that it was justified in looking elsewhere for another principal. There is no evidence that its termination of his status as principal was a reprisal by the defendants, either individually or as a body politic, for anything he had said. Neither is there any evidence that there was an invasion of Schmidt's constitutional right of free speech, nor any evidence of a deprivation of equal protection of the law. Instead the evidence shows that the reasons of the defendant board for his termination were a disappointment in his performance, a lack of confidence in him, and a conclusion that it was in the best interests of the school to seek stronger leadership. These are matters in which the defendant school district, as an employer, had a legitimate interest. The right to unfettered speech, to say one's mind without reserve and in strong tones, does not include a concomitant privilege of stoppering the ears of one's listeners to prevent them from using their faculties to make a judgment of the speaker, especially when they are public officials charged with a duty to do so.

The Court therefore concludes the plaintiff has failed to sustain the burden of proof which the law imposes. In addition, the Court holds that the plaintiff, as an "initial contract teacher" under the Wyoming Education Code, Sec. 21.1–152, W.S.1957 as amended, had no statutory right to either a statement of reasons nor to a hearing before the decision not to rehire him for another year. Nor did the plaintiff have a claim, entitlement or reasonable expectation of re-employment and therefore no property interest under state law or otherwise as an initial contract principal. Notices required under state law were given. Consequently the plaintiff did not suffer any loss of due process.

The plaintiff Schmidt's Complaint therefore should be dismissed and a judgment for the defendants, and each of them, entered accordingly.