**EUREKA–CARLISLE COMPANY,**
Appellant,

v.

**Robert B. ROTTMAN, Trustee in Bankruptcy, Appellee.**

**No. 9850.**

United States Court of Appeals
Tenth Circuit.

Aug. 15, 1968.

David J. Clarke, Denver, Colo. (Samuel J. Frazin, Denver, Colo., on the brief), for appellant.

John H. Schultz, Denver, Colo., for appellee.

Before LEWIS, Circuit Judge, WILBUR K. MILLER, Senior Circuit Judge,[*] and SETH, Circuit Judge.

WILBUR K. MILLER, Senior Circuit Judge:

Pioneer Savings Stamps, Inc. of Colorado was engaged in the trading stamp business until it was adjudicated a bankrupt on November 18, 1965. Eureka-Carlisle Company, the nation's largest manufacturer of trading stamps which had supplied Pioneer with stamps since 1961, proved an unsecured claim against the bankrupt estate in the sum of $19,296.48. The Trustee in Bankruptcy filed an objection thereto and a petition to avoid a preference, alleging that within four months of bankruptcy and while insolvent Pioneer had paid Eureka-Carlisle $6,000 on an antecedent unsecured debt.

After an evidentiary hearing the Referee made extensive findings of fact. He found *inter alia* that Pioneer was insolvent at least from June 26, 1965, until it was adjudicated a bankrupt on November 18, 1965; that in July, 1965, Walter Guy, Eureka's salesman who regularly called on Pioneer, told its president that, because of its large delinquent account, his company's credit department had directed him to advise that no more shipments of stamps from Eureka's inventory already manufactured for Pioneer would be made unless something was done about the arrearage. Other findings will be summarized hereafter, all of which are supported by the evidence considered as a whole.

Eureka knew Pioneer was desperate for stamps; without them it faced "complete chaos." So, pursuant to Guy's suggestion, Pioneer gave Eureka four checks for $1,500 each, dated respectively July 23, August 14, August 28 and September 11, 1965. The last three of the checks were postdated but all were paid when Eureka presented them on their respective dates. These checks, given within four months of bankruptcy, constitute the preference which the Trustee sought to recover. Guy also requested a financial statement, but Pioneer refused to give one, saying it could not "assemble the figures" until some time in the fall.

The Referee concluded as a matter of law that Eureka, an unsecured creditor, had received a transfer of $6,000 from Pioneer within four months of bankruptcy and when it was insolvent; "and that * * * at the time the said transfers were made, the Claimant [Eureka] had reasonable cause to believe that Pioneer was insolvent"; and that such transfers constituted a preference. It was therefore ordered by the Referee that Eureka's claim be allowed in full, provided within 30 days it should pay $6,000 to the Trustee; failing that, the claim for $19,296.48 would be disallowed[1] and judgment for $6,000 would be awarded to the Trustee against Eureka-Carlisle. The latter's petition for review was denied by the District Court and this appeal followed.

In its brief, the appellant makes three contentions: (1) that the Trustee failed

---

[*] Of the United States Court of Appeals for the District of Columbia Circuit, sitting by designation.

1. Section 57(g) of the Bankruptcy Act, 11 U.S.C. § 93(g), is as follows:
   "The claims of creditors who have received or acquired preferences, liens, conveyances, transfers, assignments or encumbrances, void or voidable under this title, shall not be allowed unless such creditors shall surrender such preferences, liens, conveyances, transfers, assignments, or encumbrances."
   See also Inter-State National Bank of Kansas City v. Luther, 221 F.2d 382, 389 (10th Cir. 1955).

to prove by a preponderance of the evidence that, at the time the transfers were made, it or its agent had reasonable cause to believe Pioneer was insolvent; (2) that the payments were not made on an antecedent debt under the terms of § 60(a) (1) of the Bankruptcy Act; and (3) that it is entitled to a set-off under § 60(c) for the value of the stamps shipped to Pioneer during the four months prior to bankruptcy.

Before discussing the first of these contentions, we reproduce pertinent statutory provisions. Section 60(a) (1) of the Bankruptcy Act, 11 U.S.C. § 96(a) (1), defines a preference:

> "A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class."

And § 60(b), 11 U.S.C. § 96(b), provides:

> "Any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent. * * *"

The Referee's finding that Eureka had reasonable cause to believe Pioneer was insolvent when the transfers were made is binding on us unless it is clearly erroneous. A finding is "clearly erroneous" when, even though there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been made. Moran Bros., Inc. v. Yinger, 323 F.2d 699 (10th Cir. 1963). Criteria for determining whether a creditor to whom a preferential

transfer has been made had reasonable cause to believe his debtor was insolvent were thus stated in McDougal v. Central Union Conference Ass'n, 110 F.2d 939, 941 (10th Cir. 1940):

> "In determining whether a preferred creditor has reasonable cause to believe a preference will be effected, every case must be viewed and interpreted in the light of its own facts, circumstances and surroundings. Joseph Wild & Co. v. Provident Life & Trust Co., 214 U.S. 292, 29 S.Ct. 619, 53 L.Ed. 1003. It is not required that the preferred creditor have actual knowledge as to the result of the transaction in creating a preference, nor that he have any actual belief on that question. All that is necessary is that he have reasonable cause to believe that a preference will be created. He need not know positively that the result of the transaction would be to effect a preference, but it will be sufficient if he have such knowledge or notice of such facts and circumstances as would incite a person of reasonable prudence under similar circumstances to make inquiry. And if inquiry would lead to the development of facts essential to the knowledge of the situation, he will be chargeable with knowledge thereof. Toof v. Martin, 13 Wall. 40, 49, 20 L.Ed. 481; Pirie v. Chicago Title, etc., Co., 182 U.S. 438, 21 S.Ct. 906, 45 L.Ed. 1171; Dutcher v. Wright, 94 U.S. 553, 24 L.Ed. 130."

In the later case of Inter-State National Bank of Kansas City v. Luther, 221 F.2d 382, 392 (10th Cir. 1955), this court repeated the *McDougal* language about inquiry and said:

> "While mere suspicion of insolvency does not amount to reasonable cause, it is sufficient if a preferred creditor has 'such knowledge or notice of such facts and circumstances as would incite a person of reasonable prudence under similar circumstances to make inquiry. And if inquiry would lead to the development of facts essential to the knowledge of the situation, he will be chargeable with knowledge thereof.' McDougal v. Central Union Conference Ass'n, 10 Cir., 110 F.2d 939, 941;

4A Remington §§ 1708–1709; 3 Collier § 60.54, p. 1001."

The question is, then, whether Eureka had knowledge or notice of facts and circumstances which would incite a person of reasonable prudence under similar circumstances to make inquiry. If so, a further question is whether inquiry would lead to a development of facts essential to the knowledge of the situation; if it would, Eureka is charged with the knowledge thereof.

Eureka knew that Pioneer's account had been delinquent for some time and that it had gotten "pretty high," as Walter Guy put it. It knew Pioneer was badly in need of stamps and could not exist without them. Although it had on hand an inventory of stamps it had previously printed for Pioneer alone, Eureka refused to deliver any of them until it had received a payment of $6,000 on its unsecured debt. Thus it used its knowledge of Pioneer's distressed condition as a lever to obtain the preferential transfers.

In fact, Eureka had such knowledge of Pioneer's "facts and circumstances" that it actually made inquiry as to its financial condition. It sent a salesman to threaten withholding of any further delivery of the stamps it knew Pioneer so direly needed, and to demand a financial statement. This statement was refused on such a flimsy excuse that a creditor of reasonable prudence would have been incited to make further inquiry. But Eureka did not send a credit man to make further inquiry; it relied on the optimistic report of its salesman which said Pioneer had cut its overhead, was trying to work out its financial problem, and that its president was a "very fine man."

The *McDougal* case, cited above, is instructive as to Eureka's duty in the circumstances. In that case, the bankrupt had been a wealthy construction contractor who was enthusiastic about and quite generous to the church of which he was a member. He became unable to pay two $5,000 notes he had given the church, but agreed to and did transfer certain real estate to it in satisfaction of the notes. This was within four months of his bankruptcy. In his trustee's suit to set aside the conveyances, the District Court found that the bankrupt was insolvent at the time of transfer, but that the church and its officers acted in good faith and without knowledge of or participation in any fraudulent transaction, and that neither the transferee nor any of its officers had reasonable cause to believe that the transferor was insolvent or that the conveyance would effect a preference. This was the basis of the District Court's action in refusing to set aside the conveyance.

In upholding its decision, this court said, 110 F.2d at 942:

"Viewing the transaction in the light of its surrounding circumstance, it is to be noted that the representatives of the transferee were church men and educators, not schooled in the intricacies of business. They were dealing with one of their own faith, one with whom they had close contact, and who was highly regarded by them. He was known to them as a big contractor, a man who had been liberal in his donations and his charitable activities. They were cognizant of the fact that he had a large amount of contracting equipment and a great number of contracts involving large sums of money. The finding of the trial court that appellee did not have reason to believe that a preference would result from this conveyance is sustained by substantial testimony and cannot be disturbed on appeal."

In this respect, the present case is the antithesis of the *McDougal* situation. Unlike the officers of the church in that case, Eureka was a very sophisticated company with 70 years' experience in dealing with trading stamp companies which bought stamps manufactured by it. Eureka did not have confidence in Pioneer such as the church men and educators had in the bankrupt in the *McDougal* case. Those men were not

"schooled in the intricacies of business;" Eureka was so schooled, particularly in the intricacies of the trading stamp business. It knew Pioneer was concealing its financial condition but, instead of making adequate inquiry, it used the power of economic life and death which it had over Pioneer to obtain preferential payments on its long-delinquent account.

■■ Eureka argues that, if it had made a reasonably diligent inquiry, it could have obtained no information because knowledge of Pioneer's insolvency could only be disclosed by Pioneer's books, to which it had no access. But Eureka could and should have sent an experienced credit man to explore other avenues of information about Pioneer's financial status; such a representative could have learned, for example, that Pioneer's stock of merchandise for the redemption of stamps was dangerously low, that its relationship with its principal customer was strained and shaky, and that rumors were afloat in the community that Pioneer was about to close its doors. We reject the notion that, since Pioneer had refused to furnish financial information, further inquiry by Eureka would have produced nothing. Since circumstances were such as would incite a man of ordinary prudence to make inquiry, Eureka is chargeable with notice of all facts which a reasonably diligent inquiry would have disclosed. A creditor may not wilfully close his eyes in order to remain ignorant of his debtor's condition. 3 Collier, Bankruptcy § 60.53, p. 1063 (14th ed. 1967). We conclude the Referee correctly held that Eureka had reasonable cause to believe Pioneer was insolvent when the four checks were exacted from it, and when they were later cashed. On all the evidence, we are left with the definite and firm conviction that the Referee and the District Court made no mistake in disposing of this issue.

Eureka's second contention—that the payments aggregating $6,000 were not made on an antecedent debt—need not detain us long. The record shows clearly and indubitably that the transfers were given and received for application to a delinquent open account of long standing, and we therefore conclude the Referee and the District Court were correct in so holding. Detailed discussion of the point is not considered to be necessary.

We turn to a consideration of the third issue presented by Eureka: whether under § 60(c) of the Bankruptcy Act [2] it is entitled to a setoff of $5,101.57, the value of the stamps shipped to Pioneer August 10, 1965,[3] after Eureka received the four checks for $1,500 each. This shipment was, of course, made during the period of four months which immediately preceded bankruptcy.

■ Eureka did not raise before the Referee or the District Court the issue whether it was entitled to a setoff, nor was the question considered or referred to, either directly or indirectly. In such circumstances, ordinarily an appellate court will not consider a question of law or fact which was not presented to, considered or decided by the trial court. This is well settled and the Tenth Circuit is in accord with the general rule established by many authorities. Justheim Petroleum Co. v. Hammond, 227 F.2d 629, 633 (10th Cir. 1955); and Dubuque Fire and Marine Ins. Co. v. Caylor, 249 F.2d 162, 165 (10th Cir. 1957). We need not be con-

2. Section 60(c) of the Bankruptcy Act, 11 U.S.C. § 96(c):

"If a creditor has been preferred, and afterward in good faith gives the debtor further credit without security of any kind for property which becomes a part . of the debtor's estate, the amount of such new credit remaining unpaid at the time of the adjudication in bankruptcy may be set off against the amount which would otherwise be recoverable from him."

3. It appears that Eureka sent Pioneer an invoice for this shipment on August 21, 1965, and Eureka claims the credit was extended on that date. We hold the credit was extended August 10, when the shipment was made on open account.

cerned about the issue, however because at the inception of oral argument, counsel for Eureka expressly abandoned the claim to a setoff.

In sum, we affirm the holdings of the Referee and the District Court that Eureka had reasonable cause to believe Pioneer was insolvent when, within four months of bankruptcy, it demanded and received transfers of $6,000 to apply on an antecedent debt, and that therefore the Trustee is entitled to recover $6,000 from Eureka.

Affirmed.