849 F.2d 1277
 Prod.Liab.Rep.(CCH)P 11,846
Pearl Laverne BURNETTE, et al., Plaintiffs-Appellees-Cross-Appellants,
v.
DRESSER INDUSTRIES, INC., Defendant-Appellant-Cross-Appellee,
Ronald Eugene TATE, et al., Plaintiffs-Appellees-Cross-Appellants,
v.
DRESSER INDUSTRIES, INC., Defendant-Appellant-Cross-Appellee.
 Nos. 87-2852, 87-2894.
 United States Court of Appeals,
Tenth Circuit.
 June 13, 1988.
Rehearing Denied Nov. 3, 1988.
 
 Bruce W. Pitzer, Oklahoma City, Okl. (Law Offices of John W. Norman, Incorporated, on the brief), for defendant-appellant-cross-appellee.
 William Tinker, Jr., Wichita, Kan. (Quentin E. Kurtz, and McDonald, Tinker, Skaer, Quinn & Herrington, on the brief), for plaintiffs-appellees-cross-appellants.
 Before LOGAN, SEYMOUR and TIMBERS,* Circuit Judges.
 TIMBERS, Circuit Judge.
 
 
 1
 Appellants Pearl Laverne Burnette, Gerald C. Burnette, Mark W. Krusor, Ronald Eugene Tate, Donna Jean Tate, Harold Dean Tally, John H. Tally, Jamie R. Tally and William B. Tally ("appellants" collectively) appeal, pursuant to a certification under 28 U.S.C. Sec. 1292(b) (Supp. III 1985), from an interlocutory order entered August 15, 1986 in the District of Kansas, Sam A. Crow, District Judge, denying their motion to amend a pretrial order to include a claim of manufacturing defects[1] against appellee Dresser Industries, Inc. ("Dresser").
 
 
 2
 Appellee Dresser cross-appeals pursuant to Sec. 1292(b) from an interlocutory order also entered August 15, 1986 in the District of Kansas, Sam A. Crow, District Judge, denying Dresser's motion for summary judgment.[2]
 
 
 3
 The instant appeal in this diversity action, arises from a tank explosion at a refinery operated by Total Petroleum Company ("Total") on June 17, 1981 at Arkansas City, Kansas. The explosion occurred while three employees of Total were filling the tank. As a result of the explosion, one employee, Ronald Tate, was severely burned. The other two, Gerald C. Burnette and Betty Tally, died. Dresser had manufactured the pressure relief valve on the tank.
 
 
 4
 On appeal, appellants claim that, unless we modify the pretrial order to add manufacturing and design defects claims against Dresser, they will sustain manifest injustice. On its cross-appeal from the order denying its motion for summary judgment, Dresser claims (1) that it had no duty to warn appellants or Total because it was a supplier of a non-defective part and was not aware that the part would be used in the way Total used it; and (2) that it had no duty to warn appellants or Total of the need to establish a servicing schedule for the valve or to use rupture disks in conjunction with the valve.
 
 
 5
 We hold that appellants failed to preserve for appeal any claim regarding design defects and that in any event the pretrial order should not be modified to include a claim based on either manufacturing defects or, had the issue been preserved, design defects. We also hold that the district court correctly denied Dresser's motion for summary judgment because there were genuine issues of material fact regarding its duty to warn.
 
 
 6
 We affirm.
 
 I.
 
 7
 We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on the instant appeal.[3]
 
 
 8
 On June 17, 1981, a storage tank exploded at Total's refinery while it was being filled with the chemical diethanolamine LFG ("DEA"). When the tank ruptured, hot DEA was spewed onto Ronald Tate, Gerald C. Burnette and Betty Tally. Tate survived, but with 59% of his body covered with burns. Tally died ten days after the explosion. Burnette died July 21, 1981, one month and three days after the explosion.
 
 
 9
 The DEA was manufactured by Dow Chemical Company ("Dow"). The tank was manufactured by Independent Tank Company ("Independent") according to specifications furnished by Nalco Chemical Company ("Nalco"). In November 1978, Nalco sold to Total 5,000 gallons of pour point depressant, which is a combustible liquid, but which may be stored in an atmospheric tank. An atmospheric tank is designed to store chemicals essentially at zero pressure. It is to be distinguished from a pressure tank. As a part of that sale of liquid, Nalco agreed to furnish Total an atmospheric tank to store the pour point depressant. Nalco did furnish the tank that was involved in the deaths and injuries referred to above.
 
 
 10
 Since the pour point depressant was a combustible liquid, it had to be stored in a tank meeting the specifications of the standard that the Underwriters' Laboratory designates as UL 142. The tank did not meet those specifications. It was made defectively. While the end of the tank that ruptured was welded on the inside and outside, the other end was welded only on the outside. Moreover, the tank was constructed of metal of insufficient thickness; it lacked a warning label regarding emergency venting required for tanks containing combustible liquids; and it was poorly welded.
 
 
 11
 Total later converted the tank into a pressure tank in order to use it for storing DEA. Specifically, Steve Long, an engineer and operations manager at Total, designed modifications for the tank which converted it to a "closed system" in which the tank would be unable to vent to the atmosphere as an atmospheric tank normally would. To convert the tank in this way, Long installed a pressure relief valve on the tank.
 
 
 12
 This valve was manufactured by Dresser. In 1976, Dresser sold the valve, a 1/2 inch "Consolidated" Steel 1980 C-2 safety relief valve, to Tulsa Gauge Company, a distributor. The valve later was acquired by Total at an unknown date and under unknown circumstances. Long selected the valve after consulting unidentified literature published by Dresser. He took the valve from an inventory of valves maintained by Total. Dresser had set the valve to open at 6 pounds per square inch ("psi").
 
 
 13
 The day after the explosion, on June 18, 1981, the valve was tested and did not open until pressure reached 148 psi. It thereafter opened consistently at 7.5 psi.
 
 
 14
 Total's employees, including Long, knew that a relief valve had to be serviced periodically and that the frequency of service was determined by the environment in which the valve was used. Total's employees established a servicing schedule for the valve under which the valve would be serviced every three months. Total, however, did not abide by this schedule. The last time it had serviced the valve before the explosion was 17 months earlier--on February 12, 1980. Appellants' expert testified that this failure to follow the servicing schedule was one cause of the accident.
 
 
 15
 According to appellants' theory of the case, a major cause of the explosion was the failure to use a rupture disk with the relief valve. A rupture disk is a safety device used to prevent unwanted contact between the chemical contents of a tank and the tank's internal component parts. Appellants claim that the DEA in the tank condensed on an uninsulated pipe attached to the tank and formed crystals on the internal parts of the relief valve which was attached to the pipe. The crystals are said to have caused the valve to seal shut so that it was unable to open and relieve the mounting pressure in the tank. Appellants claim that using a rupture disk would have prevented the valve from sealing shut.
 
 
 16
 Total employees were aware that rupture disks could be used to protect pressure relief valves. Long considered using a rupture disk but decided against it. Dresser's catalogue stated that safety devices should not be hindered by the vessel's contents, but it did not specify means to accomplish this objective and did not give any examples.
 
 
 17
 On June 16, 1983, appellants commenced the instant actions by filing their complaints.[4] The complaint named Dresser, Nalco, Independent, Dow and several others[5] as defendants. The allegations regarding Dresser are identical in each complaint. The relevant paragraphs of the complaint allege:
 
 
 18
 "17. Said tank, and its component parts, were designed, manufactured ... and sold by NALCO and DRESSER.
 
 
 19
 * * *
 
 
 20
 20. The tank rupture and BURNETTE'S decedent's injuries and harm, were the direct and proximate result of defects in the design, material, manufacture, workmanship, marketing and sale of the DEA chemical, the tank which ruptured, the equipment owned, maintained and operated by NATIONAL, STI, SNI, AMNACO, and AMCAP, and in the tank from which the DEA chemical was being pumped. Said defects caused said products to be unreasonably dangerous, constituted misrepresentations of safety, and breach of implied and express warranties, for which all defendants are strictly liable.
 
 
 21
 21. The tank rupture, and BURNETTE'S decedent's injuries and harm, were the direct and proximate result of the design of said products, for which said designs Defendants are strictly liable in tort, because the risks of said designs out-weigh [sic] the utility thereof.
 
 
 22
 22. The tank rupture, and BURNETTE'S decedent's injuries and harm, were the direct and proximate result of the carelessness and negligence of all Defendants, individually, and by and through their agents, servants, and employees acting within the scope of their employment, jointly, severally, concurrently, and in concert, as follows:
 
 
 23
 (a) Defendants failed to adequately study available design criteria and failure modes;(b) Defendants failed to adequately manufacture said products to provide safety in reasonably foreseeable uses;
 
 
 24
 (c) Defendants failed to adequately instruct and warn regarding proper assembly, maintenance, safe use, and failures of said products;
 
 
 25
 (d) Defendants failed to instruct, caution and warn regarding the proper use of said products;
 
 
 26
 (e) Defendant PENDERGRASS negligently operated the equipment in pumping said DEA chemical, and failed to use ordinary and reasonable care in the operation thereof, and failed to warn others regarding dangers associated therewith."
 
 
 27
 Following the commencement of the actions, the parties engaged in discovery. One of the interrogatories propounded by Dresser asked appellants to "state in what way the valve ... was defective in its design, material, manufacture, workmanship, marketing and sale, and the evidence ... upon which you rely in making your allegation." Appellants responded that "Pages 21 through 26 of George Stanton's Report of March, 1984 contain[ ] data upon which Plaintiff will rely in proving defect in the valve." The specified pages discussed the failure of the Dresser catalogue to state ways to prevent the contents of a tank from interfering with the functioning of a safety device or to give examples of preventive techniques. The pages also presented the theory that DEA crystals had clogged the valve. The specified pages, however, do not explicitly state that the valve was defectively designed or manufactured.
 
 
 28
 On December 21, 1984, Magistrate Wooley entered a scheduling order which provided in part that the final pretrial conference was to be held on June 14, 1985 and that all discovery was to be completed by May 15, 1985. It also provided:
 
 
 29
 "Any motions to add new theories of recovery, or defense, affirmative or otherwise, or new causes of action or counts not presently alleged in the Complaint or Answers will be filed, together with briefs in support, not later than March 15, 1985."
 
 
 30
 The magistrate later extended the date for the final pretrial conference until July 11, 1985 and the date for completing discovery until June 14, 1985, primarily because several of the defendants could not supply appellants with experts' reports by the time of the deadline.
 
 
 31
 Appellants state now that they were unable to obtain discovery of the defense experts until April 15, 1985. On May 30, 1985, appellants took the deposition of Dresser's expert, Robert B. Buhrow. The deposition took place on this date pursuant to the schedule set up by the magistrate. A transcript of the deposition became available on June 7, 1985. Buhrow testified that the valve in question had a "unique 'disc collar' which would make it extremely difficult for the disc to lift if it were surrounded by or bound by a set-up material."
 
 
 32
 On May 29, 1985, appellants took the deposition of Independent's expert, John B. Sevart. Sevart testified that it was his opinion that "the sole cause of the accident was the failure of the pressure relief valve to adequately relieve at 6 [pounds per square inch gauge ("psig") ]."
 
 
 33
 At the final pretrial conference, which was held on July 11, 1985, appellants made an oral motion to include in the final pretrial order a claim based on a manufacturing defect in the valve. The magistrate denied the motion on the ground that the motion was made "too late in the day" and failed to comply with the December 21, 1984 scheduling order. Appellants filed a motion to reconsider this decision on July 19, 1985. The magistrate denied the motion to reconsider by an order filed December 31, 1985. Appellants on January 9, 1986 sought review by the district court of this order. The district court affirmed the magistrate's order on February 18, 1986. The court denied appellants' motion to reconsider its decision in an order dated September 8, 1986.
 
 
 34
 The motions and supporting briefs of the parties, as well as orders of the magistrate and judge, all either state or imply that the issue under consideration was whether appellants could include in the pretrial order a provision concerning a manufacturing defect in the valve. There is no reference to the possibility of a design defect. Dresser does not dispute that appellants alleged several "failure to warn" claims against it in the complaint.
 
 II.
 
 35
 We turn first to appellants' claim that the district court erred in refusing to amend the pretrial order to permit them to assert a design or manufacturing defect claim against Dresser.
 
 
 36
 Preliminarily, we must observe that the briefs evince some confusion over whether appellants are attempting to assert, in addition to their "failure to warn" claims against Dresser, that the valve contained a manufacturing defect, a design defect, or both. In the district court orders of February 18, 1986 and September 8, 1986, mentioned above, the court referred only to the issue of whether the valve had a manufacturing defect. The magistrate's orders frame the issue likewise, as do the motions and supporting briefs in the district court.
 
 
 37
 On appeal, however, the parties have added the separate issue of whether appellants may assert a design defect claim. In their brief in chief point heading, appellants assert that: "UNLESS MODIFIED, THE PRETRIAL ORDER WILL RESULT INTO [sic] MANIFEST INJUSTICE TO PLAINTIFFS BECAUSE OF THE PRESENCE OF CRITICAL MANUFACTURING AND DESIGN DEFECTS AGAINST DEFENDANT DRESSER INDUSTRIES, INC." (emphasis added). Similarly, in the relevant point heading of Dresser's answering brief, it states in part that: "THE TRIAL COURT DID NOT ERR IN REFUSING TO ALLOW PLAINTIFFS TO ADD A CLAIM FOR DESIGN DEFECT...." (emphasis added). Appellants discuss claims based on both design and manufacturing defects; Dresser's answering brief is confined to a discussion of a design defect claim. In short, there is some confusion as to whether the issue to which this part of our opinion is addressed relates to a design defect, a manufacturing defect, or both.
 
 
 38
 Our Court generally will not address issues that were not considered and ruled upon by the district court. Eureka-Carlisle Co. v. Rottman, 398 F.2d 1015, 1019 (10th Cir.1968). In this case, the district court and magistrate considered only the manufacturing defect issue. Accordingly, we hold that the only issue preserved for our review is whether the pretrial order should be amended to allow appellants to assert a claim of manufacturing defect. We nevertheless will consider the issues of both manufacturing defect and design defect.
 
 
 39
 Turning to the merits of appellants' claim, under Fed.R.Civ.P. 16(e) a pretrial conference order will be modified only to prevent manifest injustice. Our review of the district court's decision here is governed by an abuse of discretion standard. Trujillo v. Uniroyal Corp., 608 F.2d 815, 817-18 (10th Cir.1979).
 
 
 40
 Appellants assert in their brief in chief that manifest injustice will result unless we modify the pretrial order since they alleged a manufacturing defect in their complaint and included in their proposed pretrial order an item designated "c. Manufacturing defect in valve." In their reply brief, they add an equitable argument, based on their assertion that "it was only as of May 15, 1985, that [appellants] were allowed discovery from defense experts based upon the extension for filing the reports granted by this Court to Defendants." Appellants state that they did not take the depositions of Dresser's and Independent's experts until May 29 and 30, 1985; that they did not receive the transcript of one of those depositions until June 12, 1985; and that they obtained what they characterize as crucial information about the valve's malfunctioning at those depositions.
 
 
 41
 Dresser responds that the complaint did not adequately alert them to the possibility that appellants would assert a design defect against them; that appellants' answer to one of their interrogatories, which called for the basis of any design or manufacturing defect claims, misled them by referring to several pages of a report by George Stanton, appellants' expert, which did not explicitly state that the valve had been defectively designed or manufactured; and that Stanton's deposition testimony, to the effect that he had "no complaint" as to the "design, construction or manufacture" of the valve, also misled them into believing they would not have to defend on such claims. Dresser asserts that appellants missed their deadline for asserting new theories by several months and should not be allowed to reopen discovery at this late date.
 
 
 42
 We now consider whether claims against Dresser based on manufacturing or design defects are set forth in the complaint. We find that they are not.
 
 
 43
 The only paragraphs which might be construed to contain such an allegation are paragraphs 17 and 20-22, set forth above. Paragraph 17 merely alleges that the "tank, and its component parts, were designed, manufactured ... and sold by NALCO and DRESSER." This, in itself, obviously does not allege a manufacturing or design defect. Paragraph 20 alleges in pertinent part that appellants' injuries were the result of "defects in the design, material, [and] manufacture ... of ... the tank which ruptured...." (emphasis added). If one were to construe "tank" to include its component parts, one might find that this paragraph, taken together with paragraph 17 (which refers specifically to Dresser), alleged a claim of design and manufacturing defect against Dresser.
 
 
 44
 We hold, however, that it would strain credulity to read the complaint in this way. It would be unfair to Dresser to do so. The reference to "the tank" in paragraph 20 did not alert the reader to the concept that "the tank, and its component parts" was meant, especially when the valve in fact was separate from "the tank" and was added later. Paragraph 17 actually cuts against appellants, moreover, since the complaint in that paragraph refers to "the tank" and "its component parts" as separate entities.
 
 
 45
 Other paragraphs of the complaint do not adequately allege claims against Dresser based on manufacturing or design defects. Paragraph 21 alleges that the explosion and the injuries were the result of "the design of said products". "[S]aid products" refers back to paragraph 20, which, as indicated above, refers only to the tank and not its component parts.
 
 
 46
 Paragraph 22 alleges in relevant part that the explosion and the injuries were the result of the
 
 
 47
 "carelessness and negligence of all Defendants ... as follows:
 
 
 48
 (a) Defendants failed to adequately study available design criteria and failure modes;
 
 
 49
 (b) Defendants failed to adequately manufacture said products to provide safety in reasonably foreseeable uses;
 
 
 50
 (c) Defendants failed to adequately instruct and warn regarding proper assembly, maintenance, safe use, and failures of said products; [and]
 
 
 51
 (d) Defendants failed to instruct, caution and warn regarding the use of said products...."
 
 
 52
 (emphasis added).
 
 
 53
 Although this paragraph refers to "all" defendants, its internal confusion foreclosed it from adequately alerting Dresser to the possibility that manufacturing or design defects were claimed against it. It refers to the "negligence" of defendants, suggesting that it is a negligence claim and not a strict liability claim. Moreover, subparagraph (a) refers to a negligent failure to study "available design criteria", not a failure to design the product properly. Subparagraph (b) refers to failure "to adequately manufacture", but is limited to "said products"; this, as indicated above, must be read as referring to the tank alone, not to a separate component part such as an added relief valve. In view of these considerations, including the confusing way in which paragraph 22 lumps all defendants together, we hold that the complaint did not adequately allege claims of manufacturing or design defects against Dresser.
 
 
 54
 Moreover, we conclude that none of the subsequent communications between the parties would have alerted Dresser to the presence of such claims. Appellants' answer to Dresser's interrogatory concerning defects in the valve referred to several pages in the report of George Stanton. These pages discussed appellants' theory that DEA crystals clogged the valve, but Stanton framed the discussion in terms of Dresser's failure to instruct and warn regarding this problem. He stated, for example, that "The Dresser catalogue states the ... requirement ... that safety devices shall not be hindered by the vessel's contents. However, the Dresser catalogue does not state how to accomplish this. It should [have] given examples of how to do this." We believe that it would be unreasonable to require Dresser to have understood the Stanton report to have supported anything but a claim of failure to warn.
 
 
 55
 We also reject appellants' assertion that they could not have raised their claim earlier because they were effectively unable to take the deposition of the defense experts until after the deadline set by the magistrate for raising new claims and it was only at these depositions that they learned of a basis for a design or manufacturing defect claim. The statements made by the defense experts regarding the valve did not add anything new to appellants' information. Dresser's expert testified only that the valve had a unique part that would make it difficult to function properly if surrounded or bound by other material. Independent's expert testified only that he believed the valve's failure caused the accident. Long before these depositions, however, appellants had knowledge of facts suggesting that the valve had malfunctioned--for example, the failure of the valve to open until it reached 148 psi when tested the day after the accident. The question was whether the malfunction was due to an inherent defect in the valve's design or manufacture, or due to improper use of the valve, perhaps caused by Dresser's failure to warn. The statements made by the two experts did not suddenly change the factual basis for appellants' claims or make it easier for them to assert a design or manufacturing defect claim, as opposed to a failure to warn claim. There is nothing in the record to indicate that Dresser stalled the depositions of its experts; they were taken well within the times specified by the pretrial order. We believe that appellants could have raised their claims earlier regardless of the schedule for depositions.
 
 
 56
 In short, we hold that appellants failed adequately to allege, before the dates set by the magistrate, a claim for manufacturing or design defect. The district court did not abuse its discretion in refusing to modify the pretrial order.
 
 III.
 
 57
 We turn next to Dresser's claim that the district court erred in denying its motion for summary judgment.
 
 
 58
 The Supreme Court recently has reaffirmed that summary judgment must be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); see Fed.R.Civ.P. 56(c). A dispute is "genuine" if a reasonable jury could return a verdict for the nonmoving party. Anderson, supra, 477 U.S. at 248.
 
 
 59
 Moreover, while the moving party bears the burden of establishing the absence of a fact issue, in the face of a properly supported motion for summary judgment the nonmoving party cannot rest on mere allegations in the pleadings. Rather it must set forth specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegations. Id. at 248, 249. It is not the trial court's function to weigh the evidence itself, to make findings of fact, or to determine the truth of the matter; rather, the trial court should determine only whether there is a genuine issue for trial. Id. at 249-50. On appeal, the appellate court must read the record in the light most favorable to the nonmoving party. Lindley v. Amoco Prod. Co., 639 F.2d 671, 672 (10th Cir.1981).
 
 
 60
 Appellants asserted claims against Dresser based on Dresser's failure in its literature accompanying the valve (1) to state the need to use a rupture disk; (2) to state the need to insulate the pipe to which the valve was attached; and (3) to provide guidance regarding the frequency of required service. Dresser asserts on appeal that it had no duty to instruct users of its valve in any of these three ways. It bases this assertion on two theories: (1) since the part it supplied was not defective, it should not be expected to anticipate every specific use to which the valve would be put and warn users as to dangers of using the valve in those ways; and (2) it had no duty to warn as to the need for a rupture disk or a servicing schedule because Steve Long and other Total employees were believed to be aware of both of these needs.
 
 
 61
 We will not address the first theory because Dresser did not raise it in its motion for summary judgment. In its memorandum and order of September 8, 1986, denying Dresser's motion for reconsideration, the district court stated that the "exclusive" argument Dresser raised in its memorandum in support of its motion for summary judgment was the second theory we mention above--that Dresser had no duty to warn because Total already was aware of the need for a rupture disk and a servicing schedule. After stating that Dresser had raised several new arguments in its motion for reconsideration, the district court held that "These arguments are not properly before the court and will not be addressed." Since the claim was not considered or ruled upon by the district court, we will not address it on appeal. Eureka-Carlisle, supra, 398 F.2d at 1019.
 
 
 62
 Moreover, we find that Dresser's second theory lacks merit. Under this theory, Dresser asserts (1) that it had no duty to warn appellants themselves, as opposed to their employer, Total, and (2) that it had no duty to warn Total regarding two of the three alleged failures to warn regarding the valve because Total's engineer, Steve Long, actually knew of the danger. It cites Jones v. Hittle Serv., Inc., 219 Kan. 627, 639-40, 549 P.2d 1383, 1395 (1976) (quoting Garrett v. Nissen Corp., 84 N.M. 16, 21, 498 P.2d 1359, 1364 (1972)), for the proposition that " 'There is no duty to warn of dangers actually known to the user of a product, regardless of whether the duty rests in negligence ... or on strict tort liability....' " See also Mays v. Ciba-Geigy, 233 Kan. 38, 661 P.2d 348 (1983).
 
 
 63
 Specifically, Dresser claims that it had no duty to warn Total regarding the need for a servicing schedule for the valve and a rupture disk because Long and other Total employees who controlled the use of the valve already knew of these needs. Regarding the servicing schedule, it points to the undisputed fact that Total employees knew that the valve's environment dictated its servicing schedule and that Total had adopted a schedule for testing the valve every three months (a schedule to which it did not adhere). Dresser reasons that the fact that Total established a servicing schedule shows that it knew of the need for such a schedule. This conclusion simply does not follow. The fact that a schedule was established also could mean that the Total employees believed they were acting out of an excess of caution in servicing the valve every three months and that it was not truly necessary to do so. Indeed, the fact that the Total employees did not adhere to the schedule could be construed to indicate that they believed it was only advisable, as opposed to necessary, to service the valve. Dresser has failed to establish that the danger was "actually known" to the user. A genuine issue of material fact remains regarding Dresser's duty to warn.
 
 
 64
 Similarly, with regard to the rupture disk, Dresser asserts that the following facts show that Total's employees knew of the need for a rupture disk: (1) that Total was aware that a rupture disk could be used to protect the valve from DEA crystallization; (2) that Total used rupture disks elsewhere in the refinery; and (3) that Steve Long considered using a rupture disk but decided against it. Again, Dresser's conclusion simply does not follow from these facts. Even if Total's employees knew a rupture disk could be used, it does not mean that they knew it should be used. A genuine issue of material fact remains as to whether Dresser should have warned regarding the rupture disk and the servicing schedule.
 
 
 65
 We hold that Dresser's motion for summary judgment was properly denied.
 
 IV.
 To summarize:
 
 66
 We hold that appellants failed to preserve for appeal any claim regarding design defects and that in any event the pretrial order should not be modified to include a claim based on manufacturing or design defects.
 
 
 67
 We also hold that the district court correctly denied Dresser's motion for summary judgment because there were genuine issues of material fact regarding its duty to warn.[6]
 
 
 68
 AFFIRMED.
 
 
 
 *
 Of the Second Circuit, by designation
 
 
 [1]
 While the parties in their appellate briefs have raised the additional issue of whether the pretrial order should have contained a design defect claim, the record indicates that the ultimate issue decided by the magistrate and district court was limited to the manufacturing defect claim. See infra, 1282
 
 
 [2]
 Appellants also have appealed from orders granting summary judgment in favor of three defendants other than Dresser, i.e., Dow Chemical Co., Nalco Chemical Co., and Independent Tank Co. We address the issues raised on that appeal in our opinion filed today. Burnette v. Dow Chemical Co., et al., 849 F.2d 1269 (10th Cir.1988)
 
 
 [3]
 Other facts are set forth in the companion opinion filed today in Burnette v. Dow Chemical Co., et al., supra note 2
 
 
 [4]
 Claims arising out of Burnette's injuries and death were included in one complaint; claims arising out of Tate's injuries and Tally's injuries and death were included in a separate complaint. Since the complaints are identical except for the identity of the plaintiffs and the nature of the injuries and death sustained, for purposes of this appeal we shall refer to them collectively as "the complaint"
 
 
 [5]
 The other defendants were National Bulk Transports, Schneider Transport, Inc., Schneider National, Inc. (formerly AMNACO, Inc.), AMCAP, Inc. (d/b/a AMCAP of Wisconsin, Inc.), Don Pendergrass, Polar Manufacturing Co., and Polar-American, Inc. These defendants were connected with the transport of the DEA from Dow to Total's refinery or the transfer of the DEA from the trailer-truck to the storage tank. The record discloses that on January 8, 1987, the court dismissed the case against Polar-American, Inc. with prejudice. The claims against the remaining defendants are still pending
 
 
 [6]
 Some three weeks after this appeal was argued and submitted, we received motions from appellants to supplement the record. We deny the motions. Aside from the untimeliness of the motions, some of the documents sought to be added already are part of the record; the others would not affect in any way the decision we reach today
 We also deny appellants' motion (as cross-appellees) for sanctions.